# UNITED STATES ex rel. MARCUS et al. v. HESS et al.*

No. 173.   Argued December 10, 1942.—Decided January 18, 1943.

---

*See also Ostrager's case, *post*, p. 562.

538

*Messrs. William Stanley* and *Charles J. Margiotti,* with whom *Mr. Homer Cummings* was on the brief, for petitioners.

*Messrs. William H. Eckert* and *Eugene B. Strass-burger,* with whom *Mr. John B. Nicklas, Jr.,* was on the brief, for respondents.

At the request of the Court, *Solicitor General Fahy* filed a brief (on which also were *Messrs. Robert L. Stern* and *Fred E. Strine*) on behalf of the United States, as *amicus curiae.*

MR. JUSTICE BLACK delivered the opinion of the Court.

Respondents, electrical contractors, were employed to work on P. W. A. projects in the Pittsburgh area. Their contracts were made with local governmental units rather than with the United States government, but a substantial portion of their pay came from the United States. Charging the respondents with defrauding the United States through the device of collusive bidding on these projects,[1] the petitioner, in the name of the United States and on his own behalf brought this action under § 5438 and §§ 3490–3493 (31 U. S. C. §§ 231–234) of the Revised Statutes.

These sections, now distributed through the statutes, are parts of what was originally the Act of March 2, 1863, 12 Stat. 696. Section 5438 contains that portion of the original Act which makes certain efforts to defraud the government a crime punishable by fine and imprison-

---

[1] The nature of the collusive bidding scheme was described by the court below as follows: "The appellants, the officers and members of the Electrical Contractors Association of Pittsburgh, conspired to rig the bidding on these projects. The pattern of the collusion was the informal and private averaging of the prospective bid which might have been submitted by each appellant. An appellant chosen by the others would then submit a bid for the averaged amount and the others all submitted higher estimates. The government was thereby defrauded in that it was compelled to contribute more for the electric work on the projects than it would have been required to pay had there been free competition in the open market." 127 F. 2d 233, 234.

ment.[2]  Section 3490 separately provides that whoever
commits "any" of the prohibited acts shall "forfeit and
pay to the United States the sum of two thousand dollars,
and in addition, double the amount of damages . . . sus-
tained . . . together with the costs of suit; and such for-
feiture and damages shall be sued for in the same suit."
Under §§ 3491, 3493, this latter action may be instituted
by "any" person in behalf of the government, and where
such a qui tam action is brought, half the amount of the
recovery is paid to the person instituting the suit while
the other half goes to the government.

In the instant case, verdict and judgment for $315,000
were rendered against the defendants, of which $203,000
was for double damages and $112,000 was an aggregate
of $2,000 sums for 56 violations of § 5438.  41 F. Supp.
197.  The Circuit Court of Appeals was of the opinion
that the government had been defrauded—a conclusion
not challenged here [3]—but held that the particular fraud
was not reached by § 5438.  It accordingly reversed.
127 F. 2d 233.

*First.* The court below, construing § 5438 with "ut-
most strictness" on the premise that qui tam or informer

---

[2] Section 5438 includes three categories of acts subject to the pen-
alty which it prescribes.  The first of these clauses, which in our
opinion governs the instant case, covers "Every person who makes or
causes to be made, or presents or causes to be presented, for payment
or approval, to or by any person or officer in the civil, military or
naval service of the United States, any claim upon or against the Gov-
ernment of the United States, or any department or officer thereof,
knowing such claim to be false, fictitious, or fraudulent . . ."  The
second clause governs the use of false certificates, etc., for the purpose
of obtaining or aiding to obtain payment of such a claim, and the
third covers conspiracy to defraud the government by obtaining or
aiding to obtain the payment of a claim.  This section, with amend-
ments not relevant to actions under § 3490, now appears as 18 U. S. C.
§§ 80, 83.

[3] Cf. *McMullen* v. *Hoffman,* 174 U. S. 639, 649.  For the general
federal competitive bidding statute see 41 U. S. C. § 5.

actions "have always been regarded with disfavor" by the courts, emphasized the absence of a direct contractual relationship between the respondents and the United States, and held that "The claims of the defendants then were simply against the local municipalities. Since the defendants had no claim upon or against the United States, this action was not authorized by the informer statutes."

We cannot accept either the interpretive approach or the actual decision of the court below. Qui tam suits have been frequently permitted by legislative action,[4] and have not been without defense by the courts.[5] Moreover, this interpretation of "utmost strictness" narrows

---

[4] "Statutes providing for actions by a common informer, who himself has no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our Government," *Marvin* v. *Trout,* 199 U. S. 212, 225. Some such statutes are 18 U. S. C. § 23 (arming vessels against friendly powers); 31 U. S. C. §§ 155, 163 (breaches of duty by the Treasurer or the Register of the United States); 25 U. S. C. §§ 193, 201 (protection of Indians); and see footnote 9, *infra.* For a statute dealing with the allocation of costs in penal actions brought by an informer, see 28 U. S. C. § 823. Statutes providing for a reward to informers which do not specifically either authorize or forbid the informer to institute the action are construed to authorize him to sue, *Adams* v. *Woods,* 2 Cranch 336.

[5] In support of the view of the court below, see *Taft* v. *Stevens Lith. and Eng. Co.,* 38 F. 28; but cf. *United States* v. *Griswold,* 24 F. 361, 366, in which the Court speaking of this section says: "The statute is a remedial one. It is intended to protect the Treasury against the hungry and unscrupulous host that encompasses it on every side, and should be construed accordingly. It was passed upon the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the Treasury is to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain. Prosecutions conducted by such means compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel."

not only the qui tam aspect of the Act, but also the criminal provisions. The decision below treats the language of § 5438 in such fashion that no criminal proceedings could be brought against the respondents, a result to which the policy on qui tam actions is immaterial even if it exists or could properly be applied. This "qui tam policy" cannot be used to detract from the meaning of the language in the criminal section; and we cannot say that the same substantive language has one meaning if criminal prosecutions are brought by public officials and quite a different meaning where the same language is invoked by an informer.

Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it; to nullify the criminal statute because of dislike of the independent informer sections would be to exercise a veto power which is not ours. Sound rules of statutory interpretation exist to discover and not to direct the Congressional will. True, § 5438 is criminal and for that reason in interpreting so much of its language as it shares in common with § 3490 we must give it careful scrutiny lest those be brought within its reach who are not clearly included; but after such scrutiny we must give it the fair meaning of its intendment. Cf. *United States* v. *Raynor,* 302 U. S. 540, 552.

We think the conduct of these respondents comes well within the prohibition of the statute, which includes "every person who . . . causes to be presented, for payment . . . any claim upon or against the Government of the United States . . . knowing such claim to be . . . fraudulent." This can best be seen upon consideration of the exact nature of respondents' relation to the government. The contracts found to have been induced by the respondents' frauds were made between them and local municipalities and school districts of Allegheny County, Pennsylvania. A large portion of the money

paid the respondents under these contracts was federal in origin, granted by the Federal Public Works Administrator, an official of the United States. 40 U. S. C. 401 (a). The jury and both courts have found that the contracts were obtained by a successfully executed conspiracy to remove all possible competition from "competitive bidding." The bidding itself was a federal requirement; all bidders were fully advised that these were P. W. A. projects; and many if not most of the respondents certified that their bids were "genuine and not sham or collusive." While payment itself, in the sense of the direct transferring of checks, was done in the name of local authorities, monthly estimates for payment were submitted by the respondents to the local sponsors on P. W. A. forms which showed the government's participation in the work and called attention to other federal statutes prohibiting fraudulent claims. It was a prerequisite to respondents' payment by the local sponsors that these estimates be filed, transmitted to, and approved by, the P. W. A. authorities. Payment was then made from a joint construction bank account containing both federal and local funds. The work was done under constant federal supervision.

The government's money would never have been placed in the joint fund for payment to respondents had its agents known the bids were collusive. By their conduct, the respondents thus caused the government to pay claims of the local sponsors in order that they might in turn pay respondents under contracts found to have been executed as the result of the fraudulent bidding. This fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the P. W. A. into the joint fund for the benefit of respondents. The initial fraudulent action and every step thereafter taken pressed ever to the ultimate goal—payment

of government money to persons who had caused it to be defrauded.

Government money is as truly expended whether by checks drawn directly against the Treasury to the ultimate recipient or by grants in aid to states. While at the time of the passage of the original 1863 Act, federal aid to states consisted primarily of land grants, in subsequent years the state aid program has grown so that in 1941 approximately 10% of all federal money was distributed in this form.[6] These funds are as much in need of protection from fraudulent claims as any other federal money,[7] and the statute does not make the extent of their safeguard dependent upon the bookkeeping devices used for their distribution. The Senatorial sponsor of this bill broadly asserted that its object was to provide protection against those who would "cheat the United States." [8] The fraud here could not have been any more of an effort to cheat the United States if there had been no state intermediary.

The conclusion that the first clause of § 5438 includes this form of "causing to be presented" a "claim upon or against the government" is strengthened by consideration of the other clauses of the statute. Clause 2 includes those who do the forbidden acts for the purpose of "aiding to obtain" payment of fraudulent claims; Clause 3 covers "any agreement, combination or conspiracy" to defraud the government by "obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim." These provisions, considered together, indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud,

---

[6] Key, The Administration of Federal Grants to States, Introduction; Bureau of the Census State and Local Government Special Study No. 19, Federal and State Aid 1941, 4.

[7] See Key, *supra*, Chapter 4, "The Audit."

[8] Congressional Globe, 37th Cong., 3rd Sess., 952.

without regard to whether that person had direct contractual relations with the government.

The situation here is in no sense like that discussed in *United States* v. *Cohn,* 270 U. S. 339, 345–347, where the government acted solely as bailee and no person had any claim against it for a payment. The Court in the *Cohn* case held that there had been no "wrongful obtaining of money . . . of the government's," while there has been such a "wrongful obtaining" here on claims which were presented either directly or indirectly to the government with full knowledge by the claimants of their fraudulent basis.

We conclude that these acts are covered by the statute under consideration.

*Second.* Previous to the filing of this action these respondents were indicted for defrauding the government and on a plea of nolo contendere were fined $54,000. They and the government, which has filed a brief amicus curiae at our request, assert that the petitioner received his information not by his own investigation, but from the previous indictment; and both argue that §§ 3490–93 should not under such circumstances be construed as permitting suit by the petitioner. The petitioner denies that he relied upon the information contained in the indictment, asserts that he spent money in conducting an investigation of his own, and claims that he presented more evidence than the government had discovered.

Even if, as the government suggests, the petitioner has contributed nothing to the discovery of this crime, he has contributed much to accomplishing one of the purposes for which the Act was passed. The suit results in a net recovery to the government of $150,000, three times as much as the fines imposed in the criminal proceedings; and this recovery was obtained at the risk of a considerable loss to the petitioner since § 3491 explicitly

provides that the informer must bear the risk of having to pay the full cost of the litigation.

Neither the language of the statute nor its history lends support to the contention made by respondents and the government. "Suits may be brought and carried on by any person," says the Act, and there are no words of exception or qualification such as we are asked to find.[9] The Senate sponsor of the bill explicitly pointed out that he was not offering a plan aimed solely at rewarding the conspirator who betrays his fellows, but that even a district attorney, who would presumably gain all knowledge of a fraud from his official position, might sue as the informer:

"The bill offers, in short, a reward to the informer who comes into court and betrays his co-conspirator, if he be such; but it is not confined to that class. Even the district attorney, who is required to be vigilant in the prosecution of such cases, may be also the informer, and entitle himself to one half the forfeiture under the qui tam clause, and to one half of the double damages which may be recovered against the persons committing the act." [10]

The government presses upon us strong arguments of policy against the statutory plan, but the entire force of these considerations is directed solely at what the government thinks Congress should have done rather than at

---

[9] There is of course no reason why Congress could not, if it had chosen to do so, have provided specifically for the amount of new information which the informer must produce to be entitled to reward. Simple informers who merely give information without formally instituting actions may collect an award for aiding in the conviction of narcotic law violators "if so directed by the court." 21 U. S. C. § 183. Cf. The authority of the Secretary of Labor who is authorized to approve awards to informers in contract labor cases. 8 U. S. C. §§ 139–140. The right of action itself may be subject to control by an administrative official, as are actions under 18 U. S. C. § 642 concerning violations of shipping laws.

[10] Cong. Globe, *supra*, 955, 956.

what it did. It is said that effective law enforcement requires that control of litigation be left to the Attorney General;[11] that divided control is against the public interest; that the Attorney General might believe that war interests would be injured by filing suits such as this; that permission to outsiders to sue might bring unseemly races for the opportunity of profiting from the government's investigations; and finally that conditions have changed since the Act was passed in 1863. But the trouble with these arguments is that they are addressed to the wrong forum. Conditions may have changed, but the statute has not.

Furthermore, one of the chief purposes of the Act, which was itself first passed in war time, was to stimulate action to protect the government against war frauds.[12] To that end, prosecuting attorneys were enjoined to be diligent in enforcement of the Act's provisions, and large rewards were offered to stimulate actions by private parties should the prosecuting officers be tardy in bringing the suits.

The very fact that Congress passed this statute shows that it concluded that other considerations of policy outweighed those now emphasized by the government; for most of the arguments made here militate against any informer action at all. Had the government filed a suit

---

[11] This consideration is apparently directed solely at the Department of Justice's desire to control the institution of these actions rather than their settlement. Sec. 3491 provides that the informer suits "shall not be withdrawn or discontinued without the consent, in writing, of the judge of the court *and the district attorney,* first filed in the case, setting forth their reasons for such consent." The authority thus given the district attorney is presumably aimed at prevention of fraudulent settlements.

[12] For a discussion of the situation which gave rise to the Act, see Report of the House Committee on Government Contracts, March 3, 1863; the discussion in the Senate on this bill, Cong. Globe, *supra,* 952, *et seq.;* the opinion of the court below, 127 F. 2d at 235; and Randall, Civil War and Reconstruction, 419, 427, 633.

prior to that instituted by this petitioner, a different question would be presented. Cf. *Francis* v. *United States,* 5 Wall. 338. Under the circumstances here, we could not, without materially detracting from its clear scope, decline to recognize the petitioner's right to sue under the Act.

*Third.* As noted above, respondents had previously been indicted and fined for defrauding the government in connection with the same transactions for which they are now being sued. They contend that the present action should be barred because of the "double jeopardy" provision of the Fifth Amendment which provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The previous indictment was brought under a general statute dealing with conspiracy to defraud the government, 18 U. S. C. § 88, and is clearly criminal in nature. For violation of it respondents were liable for a fine up to $10,000 or imprisonment for two years, or both. For failure to pay their fines, they could have been sentenced to prison. *Ex parte Watkins,* 7 Pet. 568. The punishment given in that action was not intended to compensate the government, in any manner, for damages it suffered as a result of successful execution of the conspiracy. Respondents' contention was overruled by the District Court and was not considered in the Court of Appeals. It is now urged upon us as an independent ground of support for the judgment reached below. Cf. *Helvering* v. *Gowran,* 302 U. S. 238, 245.

The application of the double jeopardy clause to particular cases has not been an easy task for the courts. The subject has recently been thoroughly explored in *Helvering* v. *Mitchell,* 303 U. S. 391, in which the Court analyzed the cases now pressed upon us and emphasized the line between civil, remedial actions brought primarily to protect the government from financial loss and actions intended to authorize criminal punishment to vindicate

public justice. Only the latter subject the defendant to "jeopardy" within the constitutional meaning. *Ibid.,* 397, 398. We may start therefore with the language of the *Mitchell* case: "Congress may impose both a criminal and a civil sanction in respect to the same act or omission; for the double jeopardy clause prohibits merely punishing twice, or attempting a second time to punish criminally, for the same offense. The question for decision is thus whether . . . [the statute in question] . . . imposes a criminal sanction. That question is one of statutory construction." *Ibid.,* 399. Is the action now before us, consisting of double damages and the $2,000 forfeiture, criminal or remedial?

It is enough for present purposes if we conclude that the instant proceedings are remedial and impose a civil sanction. The statutes on which this suit rests make elaborate provision both for a criminal punishment and a civil remedy. Violators of § 5438 may "be imprisoned at hard labor for not less than one nor more than five years, or fined not less than one thousand nor more than five thousand dollars." We cannot say that the remedy now before us requiring payment of a lump sum and double damages will do more than afford the government complete indemnity for the injuries done it. *Helvering* v. *Mitchell, supra,* 401.

It is, of course, well accepted that for one act a person may be liable both to pay damages and to suffer a criminal penalty. Long ago, this Court said, "A man may be compelled to make reparations in damages to the injured party, and be liable also to punishment for a breach of the public peace, in consequence of the same act; and may be said, in common parlance to be twice punished for the same offense." *Moore* v. *Illinois,* 14 How. 13, 19, 20. Congress has "power to give an action for damages to an individual who suffers by breach of the law." *Chattanooga Foundry* v. *Atlanta,* 203 U. S. 390, 396, 397. And it has this same

power when it, rather than some private individual, is injured by a fraud. Quite aside from its interest as preserver of the peace, the government when spending its money has the same interest in protecting itself from fraudulent practices as it has in protecting any citizen from frauds which may be practiced upon him. "The powers of the United States as a sovereign, dealing with offenders against their laws, must not be confounded with their rights as a body politic. It would present a strange anomaly, indeed, if, having the power to make contracts and hold property as other persons, natural or artificial, they were not entitled to the same remedies for their protection." *Cotton* v. *United States,* 11 How. 229, 231.

This remedy does not lose the quality of a civil action because more than the precise amount of so-called actual damage is recovered. As to the double damage provision, it cannot be said that there is any recovery in excess of actual loss for the government, since in the nature of the qui tam action the government's half of the double damages is the amount of actual damages proved. But in any case, Congress might have provided here as it did in the anti-trust laws for recovery of "threefold damages . . . sustained and the cost of suit, including a reasonable attorney's fee." 15 U. S. C. § 15.[13] Congress could remain fully in the common law tradition and still provide punitive damages. "By the common as well as by statute law, men are often punished for aggravated misconduct or lawless acts by means of civil action and the damages inflicted by way of penalty or punishment given to the party injured." *Day* v. *Woodworth,* 13 How. 363, 371. This Court has noted the general practice in state statutes of allowing double or treble or even quadruple

---

[13] This Court in *Meeker* v. *Lehigh Valley R. Co.,* 236 U. S. 412, 432–33, sustained the validity of §§ 8 and 16 of the Interstate Commerce Act which authorized payment of attorney fees to shippers injured as a result of violation of the Act by railroads.

damages. *Missouri Pacific Ry. Co.* v. *Humes,* 115 U. S. 512, 523. Punitive or exemplary damages have been held recoverable under a statute like this which combines provision for criminal punishment with others which afford a civil remedy to the individual injured. *O'Sullivan* v. *Felix,* 233 U. S. 318, 324, 325. The law can provide the same measure of damage for the government as it can for an individual.

It is argued that the $2,000 "forfeit and pay" provision is "criminal" rather than "civil," even if the double damage feature is not. The words "forfeit and pay" relate alike to the $2,000 sum and the double damages. The use of the word "forfeit" in conjunction with the word "pay" does not force the conclusion that the provision is criminal. No one doubts that Congress could have accomplished the same result by authorizing "double" or "quadruple" or "punitive" damages or a lump sum payment for attorney's fees, or by definition of the elements of "actual damages." Special consequence cannot be drawn from the use of the word "forfeit." While this might under other circumstances be an appropriate word to suggest a fine upon the failure to pay which an individual might be imprisoned, no such punishment is provided here upon default in payment. The words "forfeit and pay" are wholly consistent with a civil action for damages. *Atchison, T. & S. F. Ry. Co.* v. *Nichols,* 264 U. S. 348, 350–352; cf. *Hepner* v. *United States,* 213 U. S. 103, 104–111.

It is true that "Punishment, in a certain and very limited sense, may be the result of the statute before us so far as the wrong-doer is concerned," but this is not enough to label it as a criminal statute. *Brady* v. *Daly,* 175 U. S. 148, 157. We think the chief purpose of the statutes here was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make

552

sure that the government would be made completely whole. This conclusion is consistent with a statement made immediately before final passage of the bill. A Senator discussing these sections said: "The government ought to have the privilege of coming upon him [a fraudulent contractor] or his estate and his heirs and recovering the money of which it is defrauded." [14] The inherent difficulty of choosing a proper specific sum which would give full restitution was a problem for Congress.

*Fourth.* Section 3490 requires that the $2,000 forfeit be paid for doing "any" of the acts prohibited by § 5438. Before the District Court, petitioner contended that this sum should be exacted for every form submitted by respondents in the course of their enterprise, while respondents argued that there should be merely one $2,000 sum collected for all the acts done. The District Court concluded that the lump sum in damages should be assessed for each separate P. W. A. project. Petitioner does not object to this decision and we conclude that under the circumstances of this case each project can properly be counted separately. The incidence of the fraud on each additional project is as clearly individualized as is the theft of mail from separate bags in a post office, *Ebeling* v. *Morgan,* 237 U. S. 625; and see *Blockburger* v. *United States,* 284 U. S. 299. Cf. *Gavieres* v. *United States,* 220 U. S. 338, 342. Under respondents' view the lump sum to be paid would be about $30.00 a project; and we cannot suppose that Congress meant thus to reduce the damages recoverable for respondents' fraud and thereby allow them to spread the burden progressively thinner over projects each of which individually increased their profit.

We have examined the other contentions of the respondents and approve of the disposition of them by the courts

[14] Cong. Globe, *supra,* 958.

below. The judgment of the Circuit Court of Appeals is reversed and that of the District Court is affirmed.

*Reversed.*

MR. JUSTICE MURPHY took no part in the consideration or disposition of this case.

MR. JUSTICE FRANKFURTER, concurring:

I agree with the decision of the Court. But it seems to me that the plea of double jeopardy should be rejected on a ground other than that taken by the Court. In all other respects I join in its opinion.

This is a *qui tam* action under R. S. § 3490 to recover a "forfeiture" and "double the amount of damages which the United States may have sustained" by reason of the same acts of fraud for which the respondents were previously indicted under § 37 of the Criminal Code, 18 U. S. C. § 88, and for which substantial fines were imposed upon them. The Fifth Amendment guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." The respondents invoke this provision as a bar to this suit; and as I understand its holding, the Court rejects this plea of double jeopardy by treating the present action as one merely to make the United States whole for actual loss, and therefore without any punitive elements. The Court reaches this conclusion by applying the distinction taken in *Helvering* v. *Mitchell*, 303 U. S. 391, 400, between "sanctions that are remedial and those that are punitive." The argument seems to run thus: Double jeopardy means attempting to punish criminally twice; this is not an attempt to punish criminally because it is a civil proceeding; it is a civil proceeding because, as a matter of "statutory construction," it is a "civil sanction" which is being enforced here; and the sanction is "civil" because it is "remedial" and not "punitive" in nature.

Such dialectical subtleties may serve well enough for purposes of explaining away uncritical language in earlier cases. See, for instance, *United States* v. *Chouteau,* 102 U. S. 603, *Coffey* v. *United States,* 116 U. S. 436, and *United States* v. *La Franca,* 282 U. S. 568. But they are too subtle when the problem is one of safeguarding the humane interests for the protection of which the double jeopardy clause was written into the Fifth Amendment.

Punitive ends may be pursued in civil proceedings, and, conversely, the criminal process is frequently employed to attain remedial rather than punitive ends. It is for this reason that *scienter* has not been deemed to be a requirement in some criminal prosecutions. "Many instances of this are to be found in regulatory measures in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes . . ." *United States* v. *Balint,* 258 U. S. 250, 252.

The protection against twice being punished for the same offense should hardly be made to depend upon the necessarily speculative judgment of a court whether a "forfeiture" and "double the amount of damages which the United States may have sustained" constitutes an extra penalty, or merely an indemnity for loss suffered. If that is the issue on which the protection against double jeopardy turns, those who invoke the Constitution, as do the respondents here, ought to be allowed to prove that, as a matter of fact, the forfeiture and the double damages are punitive because they exceed any amount that could reasonably be regarded as the equivalent of compensation for the Government's loss. That in civil actions punitive damages are, as a matter of due process, sometimes allowed, see *Shevlin-Carpenter Co.* v. *Minnesota,* 218 U. S. 57, 69–70, or that there may be distinct penal and remedial provisions for the same wrong, see *O'Sullivan* v. *Felix,* 233

U. S. 318, 325, does not help solve our present problem, which arises when a second separate proceeding against the same persons for the same misconduct results in a plea based upon the double jeopardy clause. We must also put to one side the doctrine of *res judicata.* This is largely a judicial doctrine, though partly reflected in the Full Faith and Credit Clause, Article IV, § 1, and is aimed at avoiding the waste and vexation of relitigating issues already decided between the same parties. The doctrine of double jeopardy has a different history. It is part of the protection of the Constitution against pressures and penalties that offend civilized notions of justice.

In my view the proper approach to the problem of double jeopardy in a situation like this, where Congress has imposed two sanctions for misconduct, however one may label them, and has provided for their enforcement in two separate proceedings, is that which was taken by Judge (later Mr. Justice) Blatchford in *In re Leszynsky,* 16 Blatchf. 9. The short of it is that where two such proceedings merely carry out the remedies which Congress has prescribed in advance for a wrong, they do not twice put a man in jeopardy for the same offense. Congress thereby merely allows the comprehensive penalties which it has imposed to be enforced in separate suits instead of in a single proceeding. By doing this Congress does not impose more than a single punishment. And the double jeopardy clause does not prevent Congress from prescribing such a procedure for the vindication of punitive remedies.

This view commends itself to reason. It is confirmed by history. For legislation of this character, providing two sanctions for the same misconduct, enforceable in separate proceedings, one a conventional criminal prosecution, and the other a forfeiture proceeding or a civil action as upon a debt, was quite common when the Fifth Amendment was framed by Congress. See, *e. g.,* the ma-

terials referred to in *In re Leszynsky, supra,* at 16–19. Like other specific provisions of the Constitution, the double jeopardy clause must be read in the context of its times. It would do violence to proper regard for the framers of the Fifth Amendment to assume that they contemporaneously enacted and continued to enact legislation that was offensive to the guarantees of the double jeopardy clause which they had proposed for ratification.

If it be suggested that a succession of separate trials for the enforcement of a great number of criminal sanctions, even though set forth in advance in a single statute, might be a form of cruelty or oppression, the answer is that the Constitution itself has guarded against such an attempt "to wear the accused out by a multitude of cases with accumulated trials," see *Palko* v. *Connecticut,* 302 U. S. 319, 328, by prohibiting "cruel and unusual punishments." Amendment VIII. But short of that which would offend the Eighth Amendment, statutes prescribing cumulative remedies have been commonplaces in the history of federal legislation. The Sherman Law, for example, allows four means of redressing a single offense—criminal prosecution, injunction, seizure of goods, and treble damages. If a *qui tam* action like the one now before us were to be provided by Congress as a further deterrent against violation of the Sherman Law, it would certainly be commonly regarded as an additional punishment. But the double jeopardy clause would nevertheless not come into play.

It is for these reasons that I think the plea of double jeopardy in this case cannot be sustained.

MR. JUSTICE JACKSON, dissenting:

I am constrained to dissent from the second division of the opinion and from the conclusion it supports.

I cannot deny that on a literal reading the statute says what the Court's opinion renders it to say. That being

the case, one cannot be critical of those who stay close to the words of the statute because guiding principles as to where to depart and in what direction to depart and how far to depart from the literal words of a statute are so conflicting.

But that we have in these matters considerable, although ill-defined, freedom is certain. I could not better state my attitude toward the present statute as applied to this case than in the language of the present Chief Justice in *United States* v. *Katz*, 271 U. S. 354, 357:

"All laws are to be given a sensible construction; and a literal application of a statute, which would lead to absurd consequences, should be avoided whenever a reasonable application can be given to it, consistent with the legislative purpose."

Nor was he announcing unorthodox or unconventional doctrine. In *American Tobacco Co.* v. *Werckmeister*, 207 U. S. 284, 293, Mr. Justice Day said:

"But in construing a statute we are not always confined to a literal reading, and may consider its object and purpose, the things with which it is dealing, and the condition of affairs which led to its enactment so as to effectuate rather than destroy the spirit and force of the law which the legislature intended to enact.

"It is true, and the plaintiff in error cites authorities to the proposition, that where the words of an act are clear and unambiguous they will control. But while seeking to gain the legislative intent primarily from the language used we must remember the objects and purposes sought to be attained." [1]

If ever we are justified in reading a statute, not narrowly as through a keyhole, but in the broad light of the evils it aimed at and the good it hoped for, it is here. The

---

[1] See, also, *Ozawa* v. *United States,* 260 U. S. 178, 194; *Helvering* v. *New York Trust Co.,* 292 U. S. 455, 464–5; *United States* v. *Cooper Corp.,* 312 U. S. 600.

only disadvantage therefrom falls on one who sues, not to be made whole for injuries he has sustained, or to recover for goods he has delivered, or services he has performed, but solely to make profitable to himself the wrong done by others. We should, of course, fully sustain informers in proceedings where Congress has utilized their self-interest as an aid to law enforcement. Informers who disclose law violations even for the worst of motives play an important part in making many laws effective. But there is nothing in the text or history of this statute which indicates to me that Congress intended to enrich a mere busybody who copies a Government's indictment as his own complaint and who brings to light no frauds not already disclosed and no injury to the Treasury not already in process of vindication.

In this case the Government investigated respondents and on November 3, 1939, indicted them for conspiracy to defraud. On January 5 and February 6, 1940, the de- [*post, p.* 562] the Government indicted and pleas of *nolo contendere,* and fines were imposed. While the criminal case was still pending, and on January 25, 1940, petitioner commenced his informer proceeding, the averments in his complaint being substantially a copy of the indictment. It is not shown that he had any original information, that he had added anything by investigations of his own, or that his recovery is based on any fact not disclosed by the Government itself. In the companion case [*post,* p. 562] the Government indicted and pleas of *nolo contendere* were entered on January 15, 1940, and two weeks thereafter Ostrager filed his complaint alleging facts substantially identical with those in the indictment, some of the paragraphs being almost verbatim copies. We are informed that these cases have already stimulated a number of other private individuals to intervene with similar action after Government criminal proceedings had disclosed frauds.

I am sure it was never in the mind of Congress to authorize this misuse of the statute. If ever there was a case where the letter killeth but the spirit giveth life, it is this. Construed to the letter as the Court does, it becomes an instrument of abuse and corruption which can only be stopped by the timely intervention of Congress. If it were construed according to its spirit to reward those who disclose frauds otherwise concealed or who prosecute frauds otherwise unpunished, it would serve a useful purpose in the enforcement of the law and protection of the Treasury.

Since 1863 this law has been upon the statute books. Never until now has the bar dreamed that it permitted such use. When once it was attempted to commence an informer action under a similar statute after the Government had brought a civil action, this Court promptly limited the statute to preclude that sort of abuse. *Francis* v. *United States,* 5 Wall. 338. There was no specific language in the statute to support that court-made limitation, and although I find no specific language in this statute to support another, I should now say that the same limitation exists where the Government has already possessed itself of the facts and disclosed them in criminal proceedings. This is what I think the profession has generally assumed this statute to mean. If the statute has all these eighty years authorized this sort of proceeding, the legal profession of the United States has been strangely unresponsive to a Congressional proffer of windfall income.

We are justified in determining whether we will accept a new interpretation not before sustained in the history of this statute by reference to the condition of our own times rather than to those of former ones. Nothing better illustrates the difference between the conditions of 1863 and the present than the statement quoted by the Court, made by the Senate sponsor of the Informer Act, "Even

the district attorney, who is required to be vigilant in the prosecution of such cases, may be also the informer, and entitle himself to one half the forfeiture under the qui tam clause, and to one half of the double damages which may be recovered against the persons committing the act." I do not understand the Court to hold that a prosecuting attorney may now sue, but in construing the statute as applied to the plaintiff now before us we must not forget that the Senator was then speaking of law-enforcement in a nation which had not yet established a Federal Department of Justice, which did not then have a Federal Bureau of Investigation, or a Treasury investigating force, and in which the activities of the Federal Government were so circumscribed that they had not been found necessary. To accept the view of 1863 to mean that today law-enforcement officials could use information gleaned in their investigations to sue as informers for their own profit, would make the law a downright vicious and corrupting one. Fortunately no one in the executive department has ever suspected that such an interpretation as the Court now indulges could be placed upon this statute. If we were to add motives of personal avarice to other prompters of official zeal the time might come when the scandals of law-enforcement would exceed the scandals of its violation.

But even as to non-officials, to permit the informer to recover when he has not actually informed seems to me an evil result unintended by the Act. The Court's interpretation means that the Government cannot institute a criminal action that is not subject to seizure of some interloper who thereby wrests control of its course from the Government itself. As lawyers not without experience in the practicalities of law-enforcement, we know that the trial of a criminal case can be wrecked by pre-trial of the issues on the civil side of the court, particularly if the civil trial is conducted by those not interested in the criminal

prosecution. By trial, by taking of depositions, by other devices, the informer may force the premature disclosure of the Government's case, and it is certain that by collusion between one who acts as an informer and the party guilty of fraud the latter could obtain a disclosure of the case against him. We know, too, that the chance of conviction may well be prejudiced if the defendant may go before the jury and point to pending proceedings in which adequate reparations will be made. Every person prosecuted for crime, as a part of the strategy of defeating conviction, wants civil actions brought against him, and oftentimes wants to confess them or settle them in order to plead that he has squared his accounts with the law.

Moreover, we know that the assets of men engaged in criminal activities are rarely equal to the discharge of their obligations and in that event by sharing the available assets with an informer, the Government's financial recovery is diminished.

Also it has been found necessary to vest in someone the power to compromise claims of the Government, either where they are of doubtful collectibility or where the claim itself is of questionable validity. What becomes of the Attorney General's control over litigation in this respect if an informer may be admitted to share in the control of the case and may act in collusion with the guilty party? May he no longer make a compromise of a case that will withstand subsequent attack by an informer?

It must be borne in mind that this is not a case where we are adhering to a construction of a statute which has been continuously applied over its long life. In such event I should not unlikely join with my colleagues. This, however, is the case of a new construction upon an eighty-year-old statute, one so farfetched that no member of the bar has ever before ventured to offer it in any reported case.[2]

---

[2] Cf. *United States* v. *Cooper Corp.*, 312 U. S. 600, 613–614.

I would hold that the rich rewards of this kind of proceeding are reserved for those who actually and in good faith have contributed something to the enforcement of the law and the protection of the United States.