## UNITED STATES ex rel. EDELSTEIN v. BRUSSELL SEWING MACH. CO., Inc., et al.

District Court, S. D. New York.

Sept. 15, 1943.

See, also, D.C., 3 F.R.D. 87.

Abraham L. Pomerantz, of New York City (Julius Levy, of New York City, on the brief), for plaintiff.

Joseph N. Klapper, of New York City (Mortimer Scope, of New York City, of counsel), for defendants Brussell Sewing Machine Co., Inc., and Alan Mehler.

BRIGHT, District Judge.

The defendants Brussell Sewing Machine Co., Inc., and Alan Mehler (the only defendants served) move to dismiss the complaint as failing to state a claim, or for summary judgment. The action is brought under the False Claims Statute, also known as the Informer's Act, R.S. §§ 3490–3493, 31 U.S.C.A. §§ 231–234, to recover double damages, &c., alleged to have been suffered by the United States by defendants' fraud in obtaining government contracts for the manufacture of torpedo parts.

The complaint alleges that pursuant to a conspiracy to defraud the United States, between November, 1941, and the beginning of the action, the defendants, to induce the United States Naval Torpedo Station to award contracts to the Machine Company, submitted bids in which the Machine Company represented that it was a

manufacturer, set forth the price at which it would manufacture the parts, and represented its cost of manufacture and its profit estimated at 6%; that the representations were false, fictitious and fraudulent, in that (a) the Machine Company did not intend to manufacture the parts but to sub-contract therefor, (b) the costs set forth in the bid were more than twice the fair and reasonable cost of manufacturing and the Company's true estimate thereof, and (c) the anticipated and actual profit was more than 100%. It is further alleged that the contracts were awarded in reliance upon the bids and representations; and from time to time the Machine Company submitted bills for payment, which were certified as just and correct, but which were false and fraudulent by reason of the facts set forth in a, b, and c, and such bills were paid by the United States in reliance upon said statements.

It is to be noted that the only claim of fraud is in the bidding. It is not alleged that the bids were collusive, that the contracts were not fully performed, or that the parts delivered were in any way defective or deficient or not in accordance with the contract in quality, quantity, or otherwise.

The statute upon which this action is based provides, insofar as material, as follows: "Any person not in the military or naval forces of the United States * * * who shall make * * * or present * * * for payment * * * to or by any person or officer in the * * * naval service of the United States, any claim upon or against the Government * * * knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining * * * payment * * * of such claim, makes * * * any false bill * * * certificate, affidavit, or deposition * * * or who enters into any * * * conspiracy to defraud the Government * * * by obtaining * * * payment * * * of any false or fraudulent claim * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained * * *."

The contracts obtained by the Machine Company, nine in number, have been submitted to me. Their inspection was denied the plaintiff because of a clause in them that they should be treated as confidential and the contractor is prohibited from divulging any information whatsoever concerning the work under the contract to any unauthorized person.

All of them are practically identical in terms. They provide, in part, that the emergency will not permit delay incident to advertisement for competitive bids; that the contractor has an organization, plant, and facilities of sufficient capacity for doing the work; that the contractor will repair or replace any damage due to faulty material furnished by the contractor or his subcontractor; that no alien in the employ of the subcontractor shall have access to the plans or work or participate in the contract trials, without the written consent of the Secretary of the Navy under certain conditions; and that each subcontract shall include the National Defense Contract clause, which, among other things, excludes any person designated by the Secretary as undesirable.

█ It is clear that subcontracting could not be the basis for any charge of fraud. This was conceded by plaintiff upon the argument. It is now claimed that the representation that the Machine Company would manufacture, when it did not intend to do so, was one of the misrepresentations. But it is not shown that it did so state, and its contract is otherwise; and in any event it is shown by the moving papers that it did manufacture some or all of the parts and subcontracted other portions. Its contract was that it had the organization and facilities to do the work, and there is express provision governing subcontracting.

█ The price agreement and certificate on preliminary negotiations, attached to the contracts, contain a clause showing a price analysis which is obviously an estimate, and is so stated to be, and which contains an "allowance for profit" and a "total cost of production". Alongside of it is a column, not filled out in the copies furnished to me, entitled "Government Estimate" and in the third column is the "Accepted Price". It is stated below these that "The prices accepted and mutually agreed to are considered to be fair and reasonable". It is shown without contradiction that the parts contracted for had previously been made by the Navy and it would, therefore, be cognizant of their cost of manufacture. Instances are proven where bids of the Machine Company had been rejected because, after comparison

with manufacturing costs at the Naval station, the prices were found to be higher than the Navy's price.

The profit was also estimated, and if the costs were known by the Navy from its own manufacturing, it knew also the costs. It is clear that the estimates could not be accurate as to costs or profit, in view of the emergency and the consequent upsetting of labor and material markets. Even if the estimated profit can be said to have been far below the actual or anticipated return, I can see no basis of fraud. And it is certain that any excessive profits may be recaptured by the Government upon renegotiation under the Revenue Act of 1942, Chap. 619, § 801, Title VIII, 26 U.S.C.A. Int.Rev.Acts, relating to renegotiation of war contracts, effective April 28, 1942.

It is shown that in a letter dated April 1, 1943, from the Navy Department to the Machine Company, the chairman of the Price Adjustment Board wrote in part:

"The Secretary of the Navy * * * has determined that your profits under said contracts and subcontracts can be determined with reasonable certainty for all fiscal periods up to and including December 31, 1942. * * * Based on the facts disclosed by such negotiations, it has been found * * * that under said contracts and subcontracts you have realized no excessive profits * * *." It is true, however, that after the making of this motion, and obviously after plaintiff's counsel had been informed of that ruling, and after written and oral communication by him, the Machine Company on May 22, 1943, was notified that renegotiation would be reopened.

I am not convinced, however, if an excessive profit were made upon the contracts, that would be a fraud under the circumstances shown here.

And, finally, I do not think the law under which this action is brought was ever intended to include the situation here revealed. There was no collusive bidding, nor any conspiracy between the defendants and a government official, nor any failure of performance. So far as appears, the parties dealt at arm's length, neither dependent upon the other, nor influenced by their statements. The government officials were cognizant of how to manufacture the parts and the cost. The defendants were pioneering in new fields to devote their civilian plant and organization to the war effort. They submitted bids which the government could and did accept and reject. It was clearly not the intention of the statute to condemn transactions because the parts could have been obtained more cheaply under the circumstances. Nor, I believe, was it the intention of the statute to make dealings with the Government hazardous, should some one later conceive the notion that the Government had paid or contracted to pay too much. Certainly, under the circumstances shown here, there would be no fraud as between merchants, manufacturers or buyers. On the Government side were presumably expert and informed procurement officers. The Government has received what it contracted for. And the only claim shown was for the stipulated price. If such transactions are within the condemnation of the statute, however construed, no one dealing with the Government could rely on any official's decision, no contract price would be final; in fact, no contract would be of any value. Price and contract, and the informed judgment of purchasing officers, would always be subject to be set aside by informers at any time, upon claims of fraud such as here presented, and perhaps with even less resemblance of merit.

In the last analysis, the foundation of plaintiff's claim of fraud is excessive profit and the alleged concealment of subcontracting. There is no basis for the latter, and the Government could not be damaged by the former in view of the Renegotiation Act.

The cases of United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed.——, and United States v. New Orleans Chapter, 317 U.S. 562, 63 S.Ct. 393, 87 L.Ed. ——, are not to the contrary. In each there was collusive bidding among the several contractors by which all possible competition was removed, which did not exist here.

The motion for summary judgment is granted, without prejudice to any of the rights of the United States, with costs. Settle order on notice.