**Maryhelen DALY, Personal Representative of the Estate of Harry J. Daly, a/k/a Harry John Daly, Deceased,**

v.

**John I. BRIGHT, Jr., et al.**

**Civ. A. No. 71–1412.**

United States District Court,
E. D. Pennsylvania.

June 30, 1972.

---

4. 21 U.S.C. § 841.

Henry B. Fitzpatrick, Jr., Philadelphia, Pa., for plaintiff.

Edward W. Madeira, Jr., Philadelphia, Pa., for Fidelity Bank.

John G. Harkins, Jr., Philadelphia, Pa., for R. Anderson Pew.

## OPINION AND ORDER

DITTER, District Judge.

This case involves the claims of a junior creditor to subrogation rights against a senior creditor's surety. It comes before the court on a motion to dismiss on the grounds that no cause of action has been stated for which relief can be granted.

Plaintiff's decedent, Harry J. Daly, was the owner of the controlling interest in a company which operated two Maryland radio stations. In 1967 Daly entered into an agreement to sell his interest to Towson Radio, Inc., a corporation being formed by the defendants, Bright, Eisenhart, Hamilton, and Paisley. The price was $360,000—$160,000 in cash and $200,000 in the form of a note.

To obtain the capital required for their purchase, Bright, Eisenhart, Hamilton, and Paisley, arranged for a loan of $350,000 to Towson from the defendant, Fidelity Bank. This obligation was to be secured by the stock of Towson and the pledge of marketable securities worth $100,000. Moreover, repayment was guaranteed by these four defendants and further protected by the subordination of the $200,000 note which Towson gave to Daly. The marketable securities were furnished by the defendant, Pew, in return for an option to purchase Towson stock. Towson's agreement with Pew, which was also signed by Fidelity, provided that if the stock was required to repay the bank, Pew would be subrogated to the bank's rights against Bright, Eisenhart, Hamilton, and Paisley. The sale was finally completed in June, 1968, Daly accepting the note which was subordinated to the loan agreement between Towson and Fidelity. On March 9, 1969, Fidelity made a new loan of $100,000 to Towson. This loan is not senior to the Daly note. Towson defaulted and in October, 1969, Fidelity demanded payment in full and so notified the guarantors and Pew.

Eventually, Towson was sold for $825,000 with Fidelity acting as agent. After various adjustments not in issue, the sale proceeds only cover 66.02% of Towson's outstanding debts. At the time, Towson obligations to Fidelity, including interest, totalled $495,640.98. Of this amount, $380,809.03 was due on the first note and the remainder

$114,831.95 was due on the second note. Towson owed Daly [1] $214,666.65 including interest. However, a proportionate reduction caused by insufficient proceeds resulted in the following amounts being available for payment:

| For Daly | $141,679.98 |
|---|---|
| For Fidelity Bank | |
| First Note ($350,000.) | 251,410.12 |
| Second Note ($100,000.) | 75,812.05 |

Relying on the subordination of Daly's note to its first note, Fidelity claimed $108,852.73 from Daly and proposed to pay this amount to itself.

Meanwhile, Pew had been released by the bank and his stock returned. As previously observed, Pew was a surety for the bank to the extent of $100,000. He had agreed that the securities he pledged could be liquidated to pay Towson's debt to Fidelity. If the bank had found it necessary to collect all or part of its debt from Pew's stocks, he would have been subrogated to the bank's rights to obtain payment and could enforce those rights under common suretyship principles. For example, Pew could proceed against Bright, Eisenhart, Hamilton, and Paisley on their personal guarantees to the bank, or on the basis of their contract with him.

Daly resists Fidelity's proposed distribution and has brought suit against Bright, Eisenhart, Hamilton, Paisley, Pew, and Fidelity for various forms of relief. So far as Pew and Fidelity are concerned, Daly's principal assertion is that he and Pew were both sureties for the payment of Towson's note to Fidelity: Pew by reason of the stock-pledge and Daly by reason of the subordination of his note. Since the bank released Pew, Daly contends that it has forfeited its superior position so far as he is concerned because his ability to proceed against Pew, his co-surety for contribution has been impaired. Daly also contends that the defendants conspired to sell Towson for less than it was worth, released Pew's stock, and wish to rely on the subordination of Daly's note to save the bank harmless. Pew and Fidelity now move to dismiss Daly's complaint alleging that he has not stated a claim on which relief can be afforded.

■ Daly's entire case is built upon the assertion that as a subordinated creditor he had the same rights which a surety would enjoy. Of course, Daly was not a surety in the usual sense and therefore his relationship with the bank does not have all the legal incidents of suretyship. Daly had only agreed to defer his payment from Towson until after the bank had been repaid its loan. If the bank had tried to hold him as a surety and collect from his general assets, it would be unable to do so. However, what Fidelity is trying to do is to collect the money Towson owes it from the money Towson owes Daly. Daly asserts he should therefore be treated as a surety and should have been afforded a surety's right of subrogation against the actual surety, Pew.

Daly's argument is based upon two law review articles [2] which point out that when a series of liquidating payments are made by a debtor, the subordinated creditor receives nothing until the senior creditor is paid in full. So far as any payment made thereafter, the articles suggest that the subordinated creditor should be subrogated to the rights of the senior creditor to receive payments from the debtor. Seizing upon this use of the word, "subrogated," Daly argues that subrogation is an incident of suretyship and that if he has one incident of suretyship, he should have them all. Among the rights of a surety would be the right to be released from his agreement by the release of a co-surety's pledge. This is the relief which Daly says should be afforded him

---

1. Daly died on August 20, 1970, and plaintiff is his executrix. For convenience, however, I shall refer to his estate as "Daly."

2. Calligar, Subordination Agreements, 70 Yale L.J. 376, 400. Everett, Subordinated Debt—Nature, Objectives and Enforcement, 44 Boston University L.Rev. 487, 529–530.

in view of the bank's release of Pew's stock.

Unfortunately, Daly's authorities do not go that far. The articles only say that if a subordinated creditor wants additional rights, he should be sure to contract for them. It follows that if he does not do so, he cannot have even the benefits which the articles discuss. The authors do not say that a subordinated creditor is entitled to the same protection as a surety. Fidelity made one bargain with Pew and another with Daly. Both were designed to protect the bank and thereby induce it to make the loan to Towson. Although Pew and Daly shared a common goal, they approached it from different directions, taking different risks. The legal results are also different.

Fidelity's status is unaffected by its release of Pew because this release did not injure Daly. Had Pew's agreement been enforced against him and his stock liquidated to pay Towson's debt, Pew would have been subrogated to all of the rights which had been Fidelity's. Among these rights would be the right to a priority of payment so far as Daly was concerned. Thus Daly would be in exactly the same position as the one in which he finds himself—i. e., being deprived of payment from Towson in an amount sufficient to insure full payment of the loan which Towson obtained from the bank on the first note. What Daly is really saying is that he should be released from his bargain because as things turned out, Pew made a better one. He cites no legal authority to buttress this contention nor can I.

■ Although the point was not pressed at oral argument, Daly also alleges that he was the victim of a conspiracy between the bank and Pew. However, unless a plaintiff is harmed by a civil conspiracy, there can be no recovery. The gravaman of the action is the damage and not the agreement: United States ex rel. Marcus v. Hess, 41 F. Supp. 197, 215 (W.D.Pa.1941), rev'd 127 F.2d 233 (3rd Cir. 1942), rev'd 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), rehearing denied, 318 U.S. 799, 63 S.Ct. 756, 87 L.Ed. 1163 (1943). As I have pointed out, Daly suffered no harm from the bank's agreement to return Pew's stock. Even though the defendants may have acted in secret, it does not make actionable that which otherwise would not be: United Aircraft Corporation v. Boreen, 413 F.2d 694, 700 (3rd Cir. 1969); Edwards v. James Stewart & Co., 82 U.S.App.D.C. 123, 160 F.2d 935, 936 (1947).

Another assertion which Daly made but did not brief or argue was that his note was to be subordinated to only a part of the principal of Fidelity's first loan and none of the interest. However, the plain reading of the note to him shows this contention lacks merit.

Daly has failed to state a cause of action against either Pew or Fidelity and therefore their motions to dismiss must be granted.