**UNITED STATES of America ex rel. James S. STONE, Plaintiff,**

v.

**ROCKWELL INTERNATIONAL CORPORATION, Defendant.**

**Civil Action No. 89–M–1154.**

United States District Court, D. Colorado.

Nov. 19, 1996.

William R. Gray, Purvis, Gray, Schuetze & Gordon, Boulder, CO, for plaintiff.

Michael T. Gilbert and Christopher J. Koenigs, Williams, Youle & Koenigs, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

MATSCH, Chief Judge.

On November 14, 1995 the United States moved to intervene in this *qui tam* action pursuant to 31 U.S.C. § 3730(c)(3) and Rule 24(b) of the Federal Rules of Civil Procedure. This case was initiated by a complaint filed by James S. Stone, as relator, on July 5, 1989. The first claim for relief alleges that Rockwell International Corporation ("Rockwell"), as contractor operating the Department of Energy ("DOE") facility at Rocky Flats Nuclear Weapons Plant ("Rocky Flats"), committed wrongful acts and submitted false claims for reimbursement of costs and applications for fee awards under the contract in violation of the False Claims Act, 31 U.S.C. § 3729. Mr. Stone contends that Rockwell knowingly and fraudulently caused the United States to receive less property or property of a diminished value and utility than that to which it was contractually entitled and that Rockwell concealed violations of federal and state environmental and safety laws which, if known, would have adversely affected the payments it obtained through DOE. The complaint remained under seal until November 13, 1990, pursuant to orders extending the statutory time for the Department of Justice—Civil Division ("DOJ–Civ") to determine whether it would intervene and take over this action.

The Criminal Division of the Department of Justice, including the United States Attorney in this district, acting with other agencies, began investigating allegations of environmental crimes at Rocky Flats in 1988. In June 1989, agents of the Federal Bureau of Investigation and other federal law enforcement officers conducted an extensive search at Rocky Flats and other facilities of Rockwell and DOE under the authority of a federal search warrant. Documents were seized from Rockwell and from DOE. In August 1989, a special grand jury was empaneled for the specific purpose of investigating operations at Rocky Flats. The prosecutors conducting that investigation reported that approximately three and a half million pages of documents were reviewed; more than 800 witnesses were interviewed and that approximately 110 witnesses, including senior DOE officials and Rockwell blue collar workers, testified before the special grand jury.

The end result of the criminal investigation was a carefully negotiated plea agreement under which Rockwell waived indictment and pleaded guilty to an information charging ten environmental crimes on March 26, 1992. Rockwell paid stipulated fines totaling $18.5 million on June 1, 1992 when Judge Finesilver accepted the plea agreement under Rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure. The government agreed not to bring other criminal environmental and related charges against Rockwell or its officers, directors or employees. Additionally, the United States agreed not to pursue civil or administrative actions against Rockwell for violations of the Resource Conservation & Recovery Act, the Clean Water Act, the Clean Air Act, the Toxic Substances Act, or the Comprehensive Environmental Response, Compensation, and Liability Act. Although DOJ–Civ filed a notice that it declined to intervene in this case on the same day the Plea Agreement was filed, and although non-intervention was discussed during the plea negotiations, the Plea Agreement explicitly excluded the issues in this case from the government's covenant not to sue.

Other litigation between the government and Rockwell was pending during the plea negotiations. On August 15, 1991 Rockwell sued the United States in the Court of Federal Claims for breach of the contract between Rockwell and the DOE governing the operation of Rocky Flats. *Rockwell v. United States,* Case No. 91–1362. Rockwell alleged that DOE headquarters impermissibly caused DOE field officers to reduce Rockwell's award fees to an amount $6.5 million below what it should have received. That case was also discussed during the plea negotiations when Rockwell unsuccessfully at-

tempted to reach a "global settlement." On November 3, 1995 the United States filed a motion for leave to file an amended answer asserting counterclaims under the False Claims Act and forfeiture of Rockwell's claims because of fraud as provided in 28 U.S.C. § 2514. On July 17, 1996 Judge Yock granted that motion, determining that Rockwell would not be unfairly disadvantaged or prejudiced because it had notice that the government was considering filing such a motion as early as 1992 and because Rockwell contributed to discovery disputes delaying development of the Federal Claims Court case.

Counsel for the government say that the motion to intervene in this case results from information obtained through discovery in *Rockwell v. United States* and from additional information developed by counsel for Mr. Stone in this action. They contend that they now have evidence, which they did not previously have, that Rockwell intentionally concealed and misrepresented its environmental and safety performance in the submissions to DOE for contract payments. On December 21, 1995 Mr. Stone filed a pleading in support of the government's motion for leave to intervene. Rockwell filed its opposition to the government's motion on December 14, 1995, arguing that the motion violated the Plea Agreement and that the government has failed to demonstrate "good cause" for intervening more than three years after filing its notice declining to intervene.

This court has ruled, in a separate memorandum opinion and order in the criminal case, that the government's motion for leave to intervene in this case does not violate the Plea Agreement. Thus, the question now to be decided is whether the government's intervention may be permitted under § 3730(c)(3) and Rule 24(b).

Rockwell argues that "good cause" under the False Claims Act means that the government must demonstrate that it has "new evidence discovered after the first 60 days of the litigation [that] could escalate the magnitude or complexity of the fraud, causing the Government to reevaluate its initial assessment or making it difficult for the *qui tam* relator to litigate alone." That language is

from legislative history. S.Rep. No. 99–345, at 26 (1986) *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291. Rockwell contends that the publicly filed sentencing memorandum submitted by the government in support of the Plea Agreement discloses Rockwell's concealment from the DOE, the EPA, and the Colorado Department of Health, of contamination from "pondcrete" and "saltcrete" wastes to avoid compliance with state and federal regulations and to avoid "detrimental impacts on [award fee] evaluations" under its contract with DOE. This court has read that sentencing memorandum and finds that it does not, in itself, disclose a basis for concluding that Rockwell violated the False Claims Act. Significantly, the prosecution advised the court that DOE bore substantial responsibility for environmental and waste management violations, attributing failures of oversight to an agency "culture" that placed nuclear weapons production above all else, and especially above compliance with environmental and hazardous waste laws and regulations.

"Good cause" under 31 U.S.C. § 3730(c)(3) is not as limited as Rockwell suggests. The 1986 Senate Report, cited by Rockwell, describes the history of the False Claims Act, beginning with its original enactment in 1863, during the Civil War. The authority to file *qui tam* actions was deemed necessary to protect the government from fraudulent contractors. Courts interpreted the statute to permit a relator to proceed with *qui tam* actions even if he did not supply the information forming the basis of the claim. In the early 1940's some False Claims suits were brought by relators based on criminal indictments filed by the government. The government objected, arguing that a *qui tam* action should be barred when it was based only on information revealed in the criminal indictment. The race to the courthouse between the government and private parties infringed on the government's control over its criminal and civil fraud cases and hampered effective law enforcement. The Supreme Court found the statute to be restrictive of the government's control in *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943).

This decision prompted the 1943 amendments in which the Congress established a jurisdictional bar to private suits based solely on information in the possession of the government at the time the suit was brought, even if the relator was the original source of the information. *United States v. Aster*, 275 F.2d 281 (3d Cir.1960); *United States v. Pittman*, 151 F.2d 851 (5th Cir.1946). Under those amendments, if a court determined that a *qui tam* litigant was not a proper relator because of the jurisdictional bar, he lost any right to continue in the litigation, share in any proceeds, challenge the government's reasonable diligence, or object to settlements.

The 99th Congress passed the 1986 amendments to strengthen the *qui tam* provisions to make them "a more effective vehicle for private individuals to disclose fraud" which was thought to be necessary "both for meaningful fraud deterrence and for breaking the current 'conspiracy of silence' among Government contract employees." S.Ref. No. 99–345, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5279. The 1986 amendments were designed to strike a balance between encouraging private prosecution of fraudulent claims against the government and deterring frivolous or vexatious suits. The reward provision was changed to permit 25 to 30 percent of the recovery if the relator proceeds alone but only 15 to 25 percent if the government intervenes in the action. 31 U.S.C. § 3730(d). Government intervention late in the proceedings may be unfair to a relator who has expended considerable resources to advance the case and then lose up to half of the reward for bringing the action. The language quoted by Rockwell from the Senate Report regarding "new evidence . . . [that] could escalate the magnitude or complexity of the fraud. . . ." must be read in the full context of the report. Such reading leads to the conclusion that the "good cause" requirement of § 3730(c)(3) was intended to protect the interests of the relator.

In this case, James Stone is fully supportive of the government's motion to intervene. He has argued that this case is still in a very preliminary stage because Rockwell has resisted discovery. Judge Yock made a finding of undue delay in discovery in the case before the Federal Claims Court. The relationship of these two actions is apparent and now that the government has been permitted to raise the fraud issues in responding to Rockwell's claims, there is no prejudice to Rockwell in permitting intervention by the government in this case.

Even if good cause requires a showing of new evidence, the government has sustained that burden. DOJ–Civ was not privy to the information developed during the criminal investigation. Rule 6(e) of the Federal Rules of Criminal Procedure prevented the prosecutors from disclosing what was developed in the grand jury proceedings. The publicly filed documents are not clear as to the role of the DOE officials. What knowledge they had and what reliance they placed on Rockwell's reports are relevant considerations in a fraud action. The declarations filed by John A. Kolar, DOJ–Civil Division trial attorney, persuasively show that information obtained during discovery in the claims court case and made available to him by counsel for Mr. Stone have been important to the decision to intervene.

What is of paramount importance is the public interest. The operation of Rocky Flats has fueled considerable controversy over many years and the highly publicized investigation and criminal prosecution have been the subject of public debate. The former members of the special grand jury have filed a separate civil action seeking an order releasing them from the grand jury oath of secrecy because they are in disagreement with the end result of their work and do not regard the Plea Agreement as a just disposition.

This civil action provides an appropriate forum for a public inquiry into the management of this important defense facility and participation in it by the government will add significantly to the completeness and fairness of any trial. Accordingly, it is

ORDERED that the motion to intervene is granted.