UNITED STATES of America ex rel. Robert W. MATTSON, and Robert W. Mattson on his own behalf and of all other Citizens of the State of Minnesota, Plaintiff,

v.

NORTHWEST PAPER COMPANY, Defendant.

UNITED STATES of America ex rel. Robert W. MATTSON, and Robert W. Mattson on his own behalf and of all other Citizens of the State of Minnesota, Plaintiff,

v.

CONWED CORPORATION, Defendant.

Nos. 5–70 Civ. 59, 5–70 Civ. 74.

United States District Court, D. Minnesota, Fifth Division.

April 16, 1971.

Dygert & Gunn, by Richard J. Gunn; Mastor, Mattson, Lindstrom, Hart & Seran, by Wayne H. Olson, and Robert W. Mattson, Minneapolis, Minn., for plaintiff.

Dorsey, Marquart, Windhorst West & Halladay by Edward J. Schwartzbauer, Minneapolis, Minn., for defendant Northwest Paper Company.

Briggs & Morgan, by Leonard J. Keyes, St. Paul, Minn., for Conwed Corporation.

NEVILLE, District Judge.

The question here presented on defendants' motions to dismiss is: Can plaintiff a private citizen who himself has suffered no property injury or damage other than as a member of the general public, and who alleges pollution of navigable waters by two manufacturing establishments or mills which discharge "refuse" into said waters bring a civil action *qui tam*[1] to recover a portion of a criminal penalty, i. e., "a fine not exceeding $2,500 nor less than $500" enacted as the Refuse Act of 1899, a part of the original River and Harbor Act, 33 U.S.C. § 411 and providing "one-half of said fine to be paid to the person or persons giving information which shall lead to conviction" in a situation where the federal government has not prosecuted under that statute? While the court has great sympathy with plaintiff's position and objectives and believes strongly that pollution of the air and water today is one of the greatest and most acute problems facing this nation, the court nevertheless is forced to reach the conclusion for a number of reasons hereinafter stated that the answer to the question must be "no" and that plaintiff's complaints must be dismissed.

The plaintiff relator, Robert W. Mattson, commenced these two actions in the name of the United States of America to his use on August 17, 1970, alleging violations of the River and Harbor or Refuse Act of 1899, 33 U.S.C. §§ 407, 411, 413. He claims standing to initiate proceedings to enforce that statute by virtue of the doctrine of *qui tam*, based on Section 411 of the Act.[2]

Defendants have moved for dismissal under Rule 12(b) of the Federal Rules of Civil Procedure for failure to state a claim, for absence of subject matter jurisdiction and further on the grounds that plaintiff Mattson is not a real-party-in-interest and is thus without capacity to sue under Rule 17(a).

The actions were consolidated for the purpose of a hearing on these motions, following which "MECCA" (Minnesota Environmental Control Citizens Association) sought permission to participate as *amicus curiae* on the issue of standing. The court granted such permission. MECCA and all the parties since have filed exhaustive and well written briefs. In addition the court has had the oppor-

---

1. *Qui tam pro domino rege quam pro se ipso sequitur*—"Who brings the action as well for the king as for himself."

2. 33 U.S.C. § 411 provides:
   "Every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections 407, 408, and 409 of this title shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, in the discretion of the court, *one-half of said fine to be paid to the person or persons giving information which shall lead to conviction.*" [Emphasis added]

tunity to study the Congressional Committee Print of *"Qui Tam* Actions and the 1899 Refuse Act: Citizen Lawsuits Against Polluters of the Nation's Waterways," House Committee on Government Operations, Subcommittee on Conservation and Natural Resources, September, 1970, 91st Congress, 2d Session.[3]

Generally speaking, the Refuse Act[4] prohibits the discharge of "refuse matter of any kind or description whatever" into the navigable waters of the United States without an appropriate permit from the Army Corp of Engineers. Defendants each operate and maintain paper mills in Minnesota and are located on or near and discharge their effluent into the St. Louis River which flows into Lake Superior at or near Duluth, Minnesota.

The plaintiff relator contends that the provision for the payment of one-half of any fine assessed to any private citizen whose information leads to the conviction has the effect of conferring upon that citizen standing to initiate proceedings *qui tam* where neither the United States Attorney, nor the Corps of Engineers, nor the Justice Department has prosecuted or taken action.[5] In effect what the court here is asked to do is to attempt to discern what the intent of Congress was when it passed the Refuse and River and Harbor Act of 1899, or perhaps more realistically what its intent

---

3. Representative Henry S. Reuss, Chairman of that Subcommittee, was the unsuccessful plaintiff in two *qui tam* pollution actions recently dismissed by the United States District Court for the Eastern District of Wisconsin. See Reuss v. Moss-American, et al., 323 F.Supp. 848 (E.D.Wis.1971).

4. The Refuse Act was enacted as a portion of the Rivers and Harbors Appropriation Act of 1899, an "omnibus" statute consolidating various antecedent laws on the subject. Section 407 reads in part as follows:

"It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water * * * the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful."

5. Assuming that the Act in fact authorizes *qui tam* proceedings, one jurisdictional prerequisite likely would be a showing that the informer-plaintiff has first requested that the government officials charged with enforcement investigate his information and institute appropriate proceedings. It can well be argued that only after they have declined to proceed would the *qui tam* action be "ripe" for commencement.

Exhibit A to Mattson's memorandum of January 4, 1971, a letter under date of November 9, 1970, from the Assistant General Counsel for the Army Corps of Engineers to plaintiff Mattson indicates that Mattson did notify the Corps of Engineers of information alleged to establish violations of the Refuse Act. There is no indication, however, that such information was tendered prior to August 17, 1970, the date upon which these actions were commenced by the informer. This would of course be an evidentiary question.

Furthermore, Mattson nowhere alleges that his information would contribute anything to an enforcement proceeding. If, as defendants have suggested, the information he tendered was publically available to the prosecuting authorities or was otherwise within their knowledge, then it possibly could be asserted that he cannot share in any fine assessed under § 411 in any event. See *e. g.* United States v. Simons, 7 F. 709 (D.Mich. 1881) *Cf.* 31 U.S.C. § 232(C). However, in view of the court's decision herein it is not necessary to resolve these particular questions which are evidentiary in nature in any event.

would have been had it focused upon or been presented with the problem *sub judice*. Plaintiff argues that *qui tam* has its roots deep in the bowels of the English law and Congress must have known this when it provided the "moiety" to the informer; it knew that *qui tam* actions were rife in England centuries ago and continuing up to the enactment date of 1899. Counsel for plaintiff and for MECCA have cited favorable and lengthy excerpts from Holdsworth, A History of the English Law, Radzinowicz, A History of English Criminal Law and Its Administration From 1850, Vol. 2, Blackstone, "Commentaries" and Stephen, New Commentaries on the Laws of England.[6]

Conversely, defendants' counsel have referred to other quotes from Holdsworth and Radzinowicz designed to indicate that as England's civilization developed its own police force, the practice of the common informer fell into some degree of disrepute [7] ending ultimately in

6. "We have seen that in the Middle Ages [fourteenth and fifteenth centuries] it was a common expedient to give the public at large an interest in seeing that a statute was enforced by giving to any member of the public the right to sue for the penalty imposed for its breach, and allowing him to get some part of that penalty. This expedient was largely used by the legislature in [the sixteenth and seventeenth centuries] both in the case of [the] statutes dealing with trade, and in the case of *statutes dealing with many other subjects * * *.*" A History of the English Law, Vol. IV, pp. 355–56, Sir William Holdsworth.
   "Throughout the eighteenth century, and in the early years of the nineteenth, a number of statutes were passed, which so evidenced the activity of the common informers that *an important section of criminal law came to depend upon them for its enforcement. * * *.*" [Emphasis added]
   Much reliance was placed upon common informers to secure the enforcement of laws affecting public order and safety * * *
   [The common informer, stimulated by his share in the penalty, *was expected to play* a considerable part in setting the machinery of justice in motion with regard to the lesser infringements of the law. Thousands of these were committed every day, and although *most of them were non-indictable offences or misdemeanors,* they had nevertheless considerable social significance. * * *"
   The incentive of the incentive of the moiety of the appointed penalty was not confined to a few isolated penal statutes selected at random. *It formed a part of the deliberate and consistent policy of the legislature and pervaded the entire body of the criminal law.*" [Emphasis added] A History of English Criminal Law and Its Administration From 1850, Vol. 2, pp. 142–147, Professor Leon Radzinowicz.
   Blackstone in his "Commentaries," vol. III, writes:
   "But, more usually these forfeitures [meaning forfeiture of goods, fine, or penalty] created by statute are given at large, to any common informer; or, in other words, to any such person or persons as will sue for the same: and hence, such actions are called *popular* actions, because they are given to the people in general. Sometimes one part is given to the king, or to the poor or to the public use, and the other part to the informer or prosecutor; and then the suit is called a *qui tam* action * * *.*"
   Henry Stephen, in his "New Commentaries on the Laws of England", vol. III (1844) wrote as follows:
   "The remedy for the recovery of such debt, or chose in action, when withheld, is by action of debt on the judgment, or on the penal statute respectively; and in the latter case this remedy is generally designated as a penal action, or, where one part of the forfeiture is given to the crown, and the other part to the informer, a * * * *qui tam* action because it is brought by a person *qui tam pro domino rege quam pro se ipso sequitur.*

7. Holdsworth, History of English Law, Vol. IV, Boston, Little, Brown and Company, 1924:
   "The number of statutes, old and new, in which the public at large was encouraged to enforce obedience to statutes by the promise of a share of the penalty imposed for disobedience was very large. * * * But it was an expedient which was open to many obvious abuses. Old statutes which had been forgotten were unearthed and used as means to gratify ill-will. Litigation was stirred up simply in order that the

the repeal in 1951 by Parliament of all statutes permitting such common informers actions.[8]

Congress in 1899 could not of course have known of the 1951 Act of Parliament. Nevertheless, it must have been obvious by the "turn of the century" that the institution of the common informer was and had been severely criticized and was supported by doubtful public policy. Thus, though *qui tam* is nothing new or novel, plaintiff's reliance on its historically important image is dimmed when observed through modern day or even 1899 glasses.

The language indicates no Congressional intent to expand *qui tam* under this statute. On the contrary, it must have been that Congress contemplated in 1899 that the initiative to prosecute violators should reside exclusively in the government, and that the informer's right would arise only after successful prosecution, assessment of a fine (or imprisonment in the court's discretion) and if a fine were imposed, an award of one-half of such to the informer. Until that point the informer's interest in the fine, the right upon which he here predicates standing to sue, is only hypothetical.

Plaintiff and amicus MECCA have urged that there is something in the nature of a legal presumption that when a statute providing for payment of a portion of any assessed fine to the citizen informer contains no language specifically foreclosing enforcement by *qui tam* proceedings, then the statute must be read as authorizing such proceedings. Even were the case law to support that claimed presumption, it cannot be held to operate in the context of the Refuse Act where, in Section 413, Congress specifically committed the responsibility for prosecutions exclusively to the government.

Plaintiff relator relies on a dictum in footnote 4 in the only at all recent United States Supreme Court case which seems to have touched on the subject, United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1942), wherein Justice Black, writing for the majority, opined that:

"Statutes providing for a reward to informers which do not specifically either authorize or forbid the informer to institute the action are construed to authorize him to sue, Adams v. Woods, 2 Cranch 336 [2 L.Ed.2d 297]."

informer might compound for a sum of money. Threats to sue were easy means of levying blackmail." at p. 356.
"* * * Further, it was resolved, 'that it is inconvenient that the forfeiture upon penal laws or others of like nature should be granted to any before the same be received or vested in His Majesty by due and lawful proceedings; for that in our experience it maketh to the more violent and undue proceedings against the subject, to the scandal of justice and the offence of many.'" at p. 359.
Radzinowicz, A History of English Criminal Law, Vol. 2, New York, Macmillan, 1957.
"Few, if any, instruments of criminal justice were more consistently or more sharply criticised than was the common informer." at p. 139.
"These hopes were not fulfilled. Instead there arose a small but ruthless and unprincipled group of people who, from time to time, interested themselves in particular sets of statutes the enforcement of which would provide them with easy and appreciable profit." at p. 147.
"With the advent of the new Metropolitan Police, opposition against them became more relentless than ever. The police were against informers, and for the first time it could be pointed out that their disappearance would cause no serious breach in the arrangements for enforcing the law and the maintenance of good order." at p. 153.

8. The Common Informers Act 1951 (14 & 15 Geo. 6 c. 39) "An Act to abolish the common informer procedure." This act contains a schedule of some 34 prior acts of Parliament the earliest enacted in the year 1536 and bars the institution of any private actions where a part of the penalty or forfeiture is payable to a common informer.

Defendants argue vigorously that Adams v. Woods does not stand for that proposition, and that Black's dictum should, accordingly, be ignored.

It seems to the court that this dictum may be of greater comfort to the defendants than to plaintiff. While it is true that 33 U.S.C. § 411 when read alone does not either specifically authorize nor forbid an informer's action, another section of the Refuse Act, 33 U.S.C. § 413 reads in part as follows:

"The Department of Justice shall conduct the legal proceedings necessary to enforce the provisions of sections 401, 403, 404, 406, 407, 408, 409, 411 * * *, and it shall be the duty of United States Attorneys to vigorously prosecute all offenders against the same whenever requested to do so by the Secretary of the Army or by any of the officials hereinafter designated * * *."

This section specifically mentions what is now Section 411. This would seem to be a clear expression of Congressional intent that only the Department of Justice should enforce the Act. Congress easily could have provided an alternative method of informer enforcement, but did not so do.

Both sides cite, and to some extent seem to rely upon, the only Eighth Circuit case that has been found, Williams v. Wells Fargo & Co. Express, 177 F. 352 (8th Cir. 1910). In this case a *qui tam* action was dismissed because of a separate statutory provision committing enforcement of postal laws exclusively to the government. The court stated:

"It would seem at the common law actions to recover penalties prescribed by the law were often prosecuted by what was known as 'common informers.' Blackstone's Commentaries, Book 3 [Coolidge Ed.] 160, and when a portion of the penalty recovered went to the person or persons informing, and a portion to the sovereign, the action was styled a 'qui tam action.' While it has been held there must be either express statutory authorizing an informer to prosecute in his own name, or such right must be given by necessary implication, else such authority will be denied (Barnard v. Gostling, 2 East, 569; Flemming v. Bailey, 5 East, 313; Colburn v. Swett, 1 Metc. [Mass.] 232), yet, on the contrary it has been ruled where a statute gives a portion of the recovery to an informer who prosecutes for the same, as does section 4059 above quoted, such statute contains sufficient implied authority to support a prosecution by an informer in his own name. . Adams, Qui Tam, v. Woods, 2 Cranch 336, 2 L.Ed. 297; United States v. Griswold, Fed. Cas.No.15,266; Vandeventer v. Van Court, 2 N.J.L. 168; Megargell v. Hazleton Coal Co., 8 Watts & S. (Pa.) 342; Drew v. Hilliker, 56 Vt. 641; Nye v. Lamphere, 2 Gray (Mass.) 295. * * * we would feel constrained to uphold the right of plaintiff, a private citizen, as informer, to bring and maintain this action, and more especially as other sections of the act from which these are taken recognize the right of an informer to prosecute in his own name for violations of the postal laws. But the question here involved is one of procedure in the federal courts, and while the language employed in section 4059, 'one-half to the use of the person informing and prosecuting for the same,' would, in the absence of any statutory provision to the contrary, by necessary implication, authorize the informer to bring and maintain this action as a private citizen in his own name and to the use of himself and the government, yet, as has been seen, this is beyond all peradventure a suit to recover a penalty arising under the postal laws as provided in section 919 above quoted, and as that section forms a part of the procedure act in the federal courts, and as it in express terms commands that all such suits shall be brought 'in the name of the United States,' we are inclined to the opinion no other person than the United States may bring and prosecute an action to recover the pen-

alty prescribed by section 3982, above quoted." 177 F. at 355–356.

The *Williams* decision would appear to this court to be controlling in the case at bar against plaintiff relator, and almost an *a fortiori* since the statute there provided, which is not true in the case at bar, "one-half to the use of the person informing and *prosecuting for the same*" [Emphasis added]. Still the Eighth Circuit disallowed the informer's action. See also, New Rochelle v. Beckwith, 268 N.Y. 315, 197 N.E. 295, 100 A.L.R. 991 (1935); Allen v. Craig, 102 Or. 254, 201 P. 1079 (1921); Rosenberg v. Union Iron Works, 109 F. 844 (N.D.Cal.1901).

Plaintiff points out that "common informer" statutes sharing criminal fines with the informer and in some cases authorizing enforcement by civil action *qui tam* are certainly not foreign to the American legal tradition. See, *e. g.*, 19 U.S.C. § 1619; 25 U.S.C. § 201; 31 U.S.C. §§ 155, 163, 232(B), 1003; 46 U.S.C. §§ 1351–54; Marvin v. Trout, 199 U.S. 212, 225, 26 S.Ct. 31, 50 L.Ed. 157 (1905). The right to proceed *qui tam* is not, however, a product of the decisional common law. Rather it arises only by affirmative statutory authorization. In the absence of some unambiguous statutory authorization, the informer may not so proceed.

The court does not believe it would accomplish anything here to review the many cases cited by plaintiff in which the right to enforcement *qui tam* has been implied from statutes not expressly granting that right. Suffice it to say that substantially all of them turned on specific and unequivocal statutory language which clearly implied that the informer could initiate such proceedings.[9]

At least four other Federal District Courts very recently have held as does this court that a citizen informer may not sue *qui tam* under the Refuse Act. Durning v. ITT Rayonier, Inc., 325 F. Supp. 446 (W.D.Wash.1970); Bass Angler Sportsman Society v. United States Steel, 324 F.Supp. 412 (S.D.Ala.1971, a three-judge court); Bass Anglers Sportsman's Society v. United States Plywood-Champion Papers, Inc., 324 F.Supp. 938 (S.D.Tex.1971); Reuss v. Moss-American, et al., 323 F.Supp. 848 (E.D.Wis.

---

9. The false claims Act, against defrauding the government, 31 U.S.C. § 231 *et seq.* (originally Act of March 2, 1863) contains an elaborate provision (§ 232) that a private citizen suing must notify the Attorney General, who may come in and take over the action; that no settlement will be approved without notice to and consent of the Attorney General, etc. This would indicate that where Congress intended an informer's suit (in a statute passed prior to the Refuse Act of 1899) it proscribed the informer's activities and surrounded him with measures protecting the public.

Some statutes are distinguishable which confer a right on "persons as will sue for the same" or "to him who shall first sue for the same;" Pollock v. Steam Boat Laura, 5 F. 133 (S.D.N.Y.1880); Marvin v. Trout, 199 U.S. 212, 26 S.Ct. 31, 50 L.Ed. 157 (1905); penalties recoverable one-half to the "use of the person [informing and] prosecuting the same", see Taft v. Stephens Lith. & Eng. Co., 38 F. 28 (E.D.Mo.1889); Adams v. Woods, 2 Cranch 336, 2 L.Ed. 297 (1805); a suit "may be brought and carried on by any person" or "the informer, who is enabled to recover it by a civil suit", So. Exp. Co. v. Commonwealth, 92 Va. 59, 22 S.E. 809 (1895); "any resident taxpayer of the municipality may bring an action", State ex rel. Mitchell v. Shawnee, 167 Okl. 582, 31 P.2d 552 (1934); "to be recovered by the applicant whose application * * * is refused", Younts v. S. W. Bell Tel. & Tel. Co., 192 F.2d 200 (E.D.Ark.1911); a clause awarding one-half of recovery to an informer "except where the prosecution shall be first instituted on behalf of the United States, in which case the whole shall be to their use", held in United States v. Stocking, 87 F. 857 (D.Mont. 1898), to contemplate citizen prosecution.

A number of statutes do give something similar to *qui tam* civil relief, but only to one who has himself, or whose property has been injured or where he can show his damages directly flow from the defendant's illegal act such as suits under the wage and hour law, under the former Price Control Act and the antitrust laws.

1971). The court is aware of no contrary precedents.

In the three-judge opinion from the Southern District of Alabama the court stated some fundamental principles:

"First, criminal statutes cannot be enforced by civil actions. United States v. Claflin, 97 U.S. 546, 24 L.Ed. 1082 (1878); United States v. Jourden, 193 F. 986 (9th Cir. 1912). Serious constitutional problems are encountered in any attempt to impose criminal sanctions by way of civil procedures. See Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938), and Lipke v. Lederer, 259 U.S. 557, 42 S.Ct. 549, 66 L.Ed. 1061 (1922).

Equally important is the firmly established principle that criminal statutes can only be enforced by the proper authorities of the United States Government and a private party has no right to enforce these sanctions. See Keenan v. McGrath, 328 F.2d 610 (1st Cir. 1964), and Pugach v. Klein, 193 F.Supp. 630 (S.D.N.Y.1961). It has been repeatedly held that the Executive Branch through the Justice Department and U. S. Attorneys is charged with enforcement of federal criminal law and in this area has broad discretion in determining whether or not to prosecute. In the exercise of such discretion U. S. Attorneys are immune from control or interference through mandamus or otherwise by private citizens or by courts. Smith v. United States, 375 F.2d 243 (5th Cir. 1967); United States v. Cox, 342 F.2d 167 (5th Cir. 1965)."

In view of these general rules, it becomes even clearer that unless Congress specifically so provides or such intent is clearly inferable, private informer actions to enforce or collect a portion of a fine under a criminal statute should not be permitted.

Finally, the defendants contend that under the United States Justice Department Guidelines for Litigation under the Refuse Act:

"1. The policy of the Department of Justice with respect to the enforcement of the Refuse Act for purposes other than the protection of the navigable capacity of our national waters, is not to attempt to use it as a pollution abatement statute in competition with the Federal Water Pollution Control Act or with State pollution abatement procedures, but rather to use it to supplement that Act by bringing appropriate actions either to punish the occasional or recalcitrant polluter, or to abate continuing sources of pollution which for some reason or other have not been subjected to a proceeding conducted by the Federal Water Quality Administration or by a State, or where in the opinion of the Federal Water Quality Administration the pollutor has failed to comply with obligations under such a procedure. * * * Therefore, in order that we might coordinate our litigation with the programs of the Federal Water Quality Administration, civil and criminal actions against manufacturing plants which the United States Attorneys may initiate on their own authority."

Both defendants indicate that under 33 U.S.C. § 1151 *et seq.* the recently enacted Water Pollution Control Act, and in conjunction with the Minnesota Pollution Control Agency, they have had approved a plan which will over a period of some eight years bring them into compliance with government criteria as to pollution at a cost of some $6.7 million for one of the defendants and that the government has agreed to abide the time schedule and not charge a violation if and while the schedule is maintained. Though the court has heard no evidence on this phase of the case and cannot opine on its effectiveness, it would seem that this approach, well conducted, ultimately would cure or abate the offending conditions, will prevent the closing of plants with consequent loss of employ-

ment and will keep the wheels of industry turning. Plaintiff's case, of course, is not prospective in its effect, but merely attempts to assess a fine for past actions presumably for each day since 1899, hoping of course thereby to have a therapeutic effect on future actions. The court as previously stated is a strong believer in pollution control, and though not in any way basing its decision on this phase of defendants' argument, believes that the problem has reached such proportions and is so interwoven into our economic fabric and the welfare of employers and employees that *ad hoc* imposition of fines is not the better answer.

A separate order of dismissal has been entered.