### In re Harmer Coal Company

260

*Thomas M. Burke,* for Commonwealth.
*Lawrence A. Demase,* for defendant.

BROUGHTON, CHAIRMAN OF THE BOARD, February 7, 1974.—In this action for civil penalties, defendant has objected to interrogatories filed by the Department of Environmental Resources (Department) on two general grounds, and to certain of those interrogatories on specific grounds enumerated in Rule 4011 of the Pennsylvania Rules of Civil Procedure.

The general grounds are: (1) that the board was not given the power by the legislature to require the parties to submit to discovery procedures in advance of trial; (2) that even if the board has the basic authority to compel discovery, it may not constitutionally compel discovery on a civil penalties case, for the reason that civil penalties are criminal in nature, and discovery is not available to the State in a criminal proceeding.

We will deal with these arguments in order, before taking up the specific objections.

## I. *AUTHORITY OF BOARD TO COMPEL DISCOVERY*

We are convinced that the Environmental Hearing Board does have the legal authority to compel pretrial discovery.

We grant defendant's contention that we have no powers except those clearly delegated to us by the legislature: City of Pittsburgh, etc., Milk Marketing Board Appeals, 7 Pa. Comm. Ct. 180, 299 A. 2d 197 (1973); Pennsylvania Railroad Co. v. Pennsylvania Public Utility Commission, 187 Pa. Superior Ct. 590, 146 A. 2d 532, vacated on other grounds, 396 Pa. 34, 152 A. 2d 422 (1958); Commonwealth ex rel. Margiotti v. Orsini, 368 Pa. 259, 81 A. 2d 891 (1951).

In this case, section 1921-A(e) of The Administrative Code of April 9, 1929, P. L. 177, as amended, 71 PS §510-21(e), provides that the Environmental Quality Board (EQB) shall adopt rules of procedure for the Environmental Hearing Board. Among the rules the EQB adopted were those objected to by defendant herein, providing for pretrial discovery. Defendant argues that the authorization to adopt procedural rules does not carry with it the authorization to permit this board to compel pretrial discovery.

We do not see how it can be seriously argued that the rules relating to pretrial discovery are other than procedural rules. See Miner v. Atlass, 363 U.S. 641 (1960). They are not "outcome determinative" in the sense that the rules for the grant of a supersedeas (Department of Environmental Resources v. Crucible Inc., EHB docket no. 73-342-B, opinion and order sur supersedeas filed December 11, 1973), or a statute of limitations (Guaranty Trust Co. v. York, 326 U.S. 99 (1945)) are outcome determinative. Prima facie, then, it would appear to be within the power of the EQB to authorize pretrial discovery procedures.

But defendant argues that even if pretrial discovery rules might for some purposes be considered procedural rules, they go far beyond ordinary procedural rules, in their potential for bringing about oppression and annoyance of citizens and litigants, and that an affirmative and explicit authorization by the legislature should be required. Defendants cite Commonwealth ex rel. Margiotti v. Orsini, supra, and Federal Maritime Commission v. Anglo-Canadian Shipping Co., 335 F. 2d 255 (C. A. 9, 1964), in support of this argument, as well as several cases from other State courts.[1]

In the Federal Maritime Commission case, the court said, 335 F. 2d at page 260:

"So, here, it seems fair to say that there inheres in discovery procedure involving the prehearing production and copying of documents, a potential impact upon litigants so much greater than that associated with ordinary procedural rules, that the failure of Congress to affirmatively authorize the same should be taken as a deliberate choice."

We must admit some mystification as to exactly why pretrial discovery is so earthshaking in its effect on litigants. In Commonwealth ex rel. Margiotti v. Orsini, supra, the court was dealing with the power of subpoena, the power to compel the appearance of persons and the production of documents in an abso-

---

[1] Romero v. California State Labor Commission, 276 Cal. 2d 787, 81 Cal. 281 (1969); Alongis v. City of New York, 283 N. Y. Supp. 2d 301, 54 N. Y. Misc. 2d 771 (1967); State ex rel. Thompson v. Nash, 27 Wis. 2d 183, 133 N.W. 2d 769 (1965). All of these are dissimilar in their factual context and involve specific statutory language and legislative history in, respectively, California, New York and Wisconsin. Both sides have tried to draw policy arguments and general principles from these cases, I think without much success. I do not think they are applicable, and they will not be further distinguished.

lute sense. It held, rightly I think, that such a power must be explicitly granted. Here, this board already has the power to subpoena persons and documents. Pretrial discovery procedures merely change the time for that compulsion from trial to a time before trial.

Circuit Judge Pope's concurring opinion in the Federal Maritime Commission case bears quoting:

"My concurrence here is induced in part by my feeling that pre-trial discovery is much less important in administrative proceedings than in cases tried in a district court. In the latter cases, once trial is begun the parties would expect the trial to proceed to a conclusion without interruption, and to make their entire case during that time. But with an administrative hearing before an examiner a common procedure is to take testimony at different sittings, often in different cities, and at more or less widely separated intervals. With its subpoena power the Commission can compel the attendance of witnesses who are, or who represent, adverse parties, and upon their examination the Examiner can readily ascertain what correspondence or other papers are in the possession of the witness. Production of these can be procured for use at subsequent sessions.

"I cannot believe that the correspondence sought here cannot be obtained under existing valid procedures."

Also worth noting is the fact that the majority opinion in the Federal Maritime Commission case relied on Miner v. Atlass, 363 U.S. 641 (1960), which decided only that a local admiralty rule at the District Court for the Northern District of Illinois adopting the Federal Rules of Civil Procedure with respect to pre-trial discovery, was inconsistent with the General Admiralty Rules and, therefore, not legally valid in light of the limiting language of Rule 44 of those

General Admiralty Rules. The court did note, 363 U.S. at 649-50, that

"[T]he matter is one which, though concededly 'procedural,' may be of as great importance to litigants as many a 'substantive' doctrine, and which arises in a field of federal jurisdiction where nationwide uniformity has traditionally always been highly esteemed."

Admittedly, rules governing pretrial discovery are important. We do not see that that fact means they somehow become "more than" rules of procedure, such that the authorization to the EQB to adopt them must be specific. As Justice Brennan noted, dissenting in Miner v. Atlass, 363 U.S. 641, 655:

"Clearly a rule providing for discovery by way of deposition practice is one regulating procedure. See Sibbach v. Wilson & Co., 312 U.S. 1. The Court does not venture to deny this. Of course this procedural rule may be as important as many a 'substantive' doctrine, but there is nothing in General Rule 44 confining the local rulemaking power to exercises in the trivial."

We note also the remarks of Justice Harlan in Hickman v. Taylor, 329 U.S. 495, 500-01, 507 (1947), (footnotes omitted):

"The pre-trial deposition-discovery mechanism established by Rules 26 to 37 is one of the most significant innovations of the Federal Rules of Civil Procedure. Under the prior federal practice, the pre-trial functions of notice-giving, issue-formulation and fact-revelation were performed primarily and inadequately by the pleadings. Inquiry into the issues and the facts before trial was narrowly confined and was often cumbersome in method. The new rules, however, restrict the pleadings to the task of general notice-giving and invest the deposition-discovery process with a vital

role in the preparation for trial. The various instruments of discovery now serve (1) as a device, along with the pre-trial hearing under Rule 16, to narrow and clarify the basic issues between the parties, and (2) as a device for ascertaining the facts, or information as to the existence or whereabouts of facts, relative to those issues. Thus civil trials in the federal courts no longer need be carried on in the dark. The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial.

". . .

"We agree, of course, that the deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession. *The deposition-discovery procedure simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise.*" (Italics supplied.)

We note that the philosophy behind the discovery rules in the Pennsylvania Rules of Civil Procedure appears to be that the scope of discovery should approximate what might be available for possible presentation at trial, whether for a case in chief, rebuttal or for purposes of cross-examination. Cf. Philip W. Amram and Sidney Schulman, The April, 1962, Amendments to Pennsylvania Rules of Civil Procedure, 33 Pa. Bar Assn. Q. 505, 510-11 (1962). This confirms our judgment that the crucial power is the power of subpoena, a power that is explicitly granted to the

board by the legislature. It was this power that was absent in Commonwealth ex rel. Margiotti v. Orsini, supra, relied upon by defendant. Once that power has been granted, the manner and timing of its application becomes a matter to be governed by reasonable rules of procedure.

Pretrial discovery does merely advance the time when information is required to be divulged. It reduces surprise and time at the trial. The board's rules of procedure depend very heavily on pretrial exchanges of information in order to narrow and clarify the issues for trial. And while we grant that rules allowing broad pretrial discovery are very important, importance does not make them other than rules of procedure: there is nothing in the Administrative Code of April 9, 1929, that limits the EQB to exercises in the trivial.

We are convinced that rules relating to discovery are within the power of the EQB to adopt, as rules of procedure, and that compelling discovery before trial does not so interfere with any rights of parties before the board that we should require specific authorization by the legislature, as distinguished from the general authorization to adopt rules of procedure before applying Rule 21.15 of the board's rules of procedure, authorizing pretrial discovery.

## II. *Discovery by the Commonwealth in Civil Penalty Cases*

Defendant further argues that it would be improper to allow discovery against it in a civil penalty case, since civil penalties are criminal in nature, and discovery may not be allowed against defendant in a criminal case.

As we have noted in another case, Department of Environmental Resources v. Froehlke, E.H.B. docket no. 72-341, filed July 31, 1973:

"We note that the standard of proof, in a civil penalty case, is proof by a preponderance of the evidence. One might analogize civil penalty actions either with criminal actions or with tort actions that call for punitive damages. Civil penalty actions do not brand a Defendant as a criminal, however and, although wilfullness is a factor we are required to consider in setting the amount of damages, 35 PS §691.605, so is wilfullness a major factor in most tort punitive damage situations. Prosser, *Torts* 7-14 (4th Ed. 1971). Harm to the waters of the Commonwealth, which we are also required to consider, 35 PS §691.605, suggests a compensatory damage aspect of civil penalty actions much more analogous to tort damages than criminal penalties. Another major factor we must consider is the cost of clean-up.

"On balance, we are convinced the Legislature, by creating the action for civil penalties, intended among other things to create a remedy that would provide some economic dissuasion to polluters, some compensation to the public, and also a remedy that did not require proof beyond a reasonable doubt. In this sense, civil penalty actions are analogous to abatement orders. See North American Coal Corp. v. Commonwealth, 2 Pa. Cmwlth. 441, 279 A. 2d 388 (1970). The fact that a jury trial is not provided for strengthens our conviction in this regard." Id. at pages 14 and 15.

In that case, those remarks dealt with the question of the standard of proof—whether the department's case must be proven beyond a reasonable doubt, or by a preponderance of the evidence. In that context, they were dicta, since we ultimately held that we would be satisfied of the truth of the facts in dispute regardless of which standard of proof applied.

We are, however, satisfied that civil penalties are not criminal in nature. The factors that we are required to consider in determining the amount of damages, with one exception, are compensatory in nature. The general structure of the remedies specified in the Clean Streams Act of June 22, 1937, P. L. 1987, as amended, 35 PS §§691.1, et seq., convinces us that the provision for statutory actions for civil penalties was meant to be a partial substitute for private civil damage actions. The latter, as is well known (see, e.g. Maloney, Judicial Protection of the Environment: A New Role for Common-Law Remedies, 25 Vanderbilt L. Rev. 145 (1972), and Rogers v. Bond Bros., 279 Ky. 239, 130 S.W. 2d 22 (1939)), are extremely difficult to win, even if financing the suit is made easier by bringing it as a class action, because of the difficulty of proving cause in fact. Furthermore, harm to the waters of the Commonwealth is an almost purely public harm for which the government, as representative of the public, is the logical plaintiff. See Pittsburgh v. Insurance Commissioner, 4 Comm. Ct. 262, 269 (1971), revised 448 Pa. 466 (1972), reversal based on the specific language of the Nonprofit Hospital Plan Act of June 21, 1937, P. L. 1948, as amended, 40 PS §§1401, et seq. And see section 4 of the Clean Streams Law, supra, 35 PS §691.5. The same is true of some of the uses of the waters of the Commonwealth, e.g., public water supply, Pennsylvania Railroad v. Sagamore Coal Co., 281 Pa. 233 (1924), or harm to the aquatic biosystem: the Fish Law of May 2, 1925, P. L. 448, as amended, 30 PS §§1, et seq.

The one factor that we must consider that may be said to relate not to the amount of harm is "the degree of willfulness" of the pollutional act.[2] In other cases

---

[2] The phrase, *"degree of willfulness"* suggests that we are to assess civil penalties not merely for deliberate acts, but also for

we have analogized this factor to punitive damages in tort law. See Commonwealth v. Froehlke, supra. This analogy might allow us to consider the relative degree of fault, deliberateness, or degree of negligence, in assessing relatively higher civil penalties when the amount of harm to the waters of the Commonwealth, or its uses, was modest or, alternatively, to assess lower civil penalties when the harm was greater but there was little or no fault demonstrated.

The mere fact that we must consider the degree of fault, the relative deliberateness or lack of care, as one factor in setting civil penalties does not mean that civil penalties are criminal in nature, any more than a shift to a comparative negligence approach in automobile accident cases involving government vehicles would. In each case, one of the purposes of having a rule that allows damages at all is deterrence. (This is somewhat muted in automobile accident cases by the present system of liability insurance, and would be even further limited by a no-fault insurance system.) In each case, the primary purpose is compensation for the harm, with deterrence as a secondary purpose. The fact that, in each case, the degree of fault is one element that enters (or would enter, in the case of a comparative negligence approach) the equation to determine the *amount* of damages does not change that primary purpose.

---

pollution that occurs as a result of a failure to take adequate care to prevent pollution. It also suggests (since by definition, if adequate care had been taken, no pollution would have occurred) that we are to take into account whether, and the extent to which, that failure to take adequate care was itself deliberate. Thus, the phrase, "degree of willfulness' really translates into "degree of fault," and would require us to consider degree of negligence, as well as pure willfulness. In each case, we are to consider degree of fault only as one factor, along with the others we are required by the statute to give weight to.

Defendant cites Commonwealth qui tam, ex rel. Johnson v. Betts, 76 Pa. 465 (1875); Bachman v. Messina, 45 D. & C. 47 (C. P. Mercer Co., 1942); Helvering v. Mitchell, 303 U.S. 391 (1938), and United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943), as authority to the contrary.

Helvering v. Mitchell, supra, and United States ex rel. Marcus v. Hess, supra, which quotes and follows Helvering v. Mitchell, do not seem to us to support the conclusion urged by defendant. Both cases dealt with a question whether an action by the United States to recover double indemnity damages for fraudulently inducing the payment of government moneys relative to certain contractual claims was or was not criminal, so as to invoke the protection of the double jeopardy clause of the Constitution. The Supreme Court's analysis in Marcus, 317 U.S. at 549, was as follows:

" 'Congress may impose both a criminal and a civil sanction in respect to the same act or omission; for the double jeopardy clause prohibits merely punishing twice, or attempting a second time to punish criminally, for the same offense. The question for decision is thus whether . . . [the statute in question] . . . imposes a criminal sanction. That question is one of statutory construction.' [Helvering v. Mitchell, 303 U.S. 399]. Is the action now before us, consisting of double damages and the $2,000 forfeiture, criminal or remedial?

"It is enough for present purposes if we conclude that the instant proceedings are remedial and impose a civil sanction. The statutes on which this suit rests make elaborate provision both for a criminal punishment and a civil remedy. Violators of §5438 may 'be imprisoned at hard labor for not less than one nor more than five years, or fined not less than one thousand nor more than five thousand dollars.' We cannot say

that the remedy now before us requiring payment of a lump sum and double damages will do more than afford the government complete indemnity for the injuries done it. Helvering v. Mitchell, supra, 401."

The court went on to analyze whether the double indemnity provision made the action criminal, and concluded that it did not, because the action was primarily compensatory in nature, with punishment, and deterrence, being only a secondary purpose: 317 U.S. at 550-552. (Footnotes omitted.)

"This remedy does not lose the quality of a civil action because more than the precise amount of so-called actual damage is recovered. As to the double damage provision, it cannot be said that there is any recovery in excess of actual loss for the government, since in the nature of the qui tam action the government's half of the double damages is the amount of actual damages proved. But in any case, Congress might have provided here as it did in the anti-trust laws for recovery of 'threefold damages . . . sustained and the cost of suit, including a reasonable attorney's fee.' 15 U.S.C. §15. Congress could remain fully in the common law tradition and still provide punitive damages. 'By the common as well as by statute law, men are often punished for aggravated misconduct or lawless acts by means of civil action and the damages inflicted by way of penalty or punishment given to the party injured.' Day v. Woodworth, 13 How. 363, 371. This Court has noted the general practice in state statutes of allowing double or treble or even quadruple damages. Missouri Pacific Ry. Co. v. Humes, 115 U.S. 512, 523. Punitive or exemplary damages have been held recoverable under a statute like this which combines provision for criminal punishment with others which afford a civil remedy to the individual injured. O'Sullivan v. Felix, 233 U.S. 318,

324, 325. The law can provide the same measure of damage for the government as it can for an individual . . .

"It is true that 'Punishment, in a certain and very limited sense, may be the result of the statute before us so far as the wrong-doer is concerned,' but this is not enough to label it as a criminal statute. Brady v. Daly, 175 U.S. 148, 157. We think the chief purpose of the statutes here was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole. This conclusion is consistent with a statement made immediately before final passage of the bill. A Senator discussing these sections said: 'The government ought to have the privilege of coming upon him [a fraudulent contractor] or his estate and his heirs and recovering the money of which it is defrauded.' The inherent difficulty of choosing a proper specific sum which would give full restitution was a problem for Congress."

As noted by Justice Frankfurter, concurring, 317 U.S. at 554:

"Punitive ends may be pursued in civil proceedings, and, conversely, the criminal process is frequently employed to attain remedial rather than punitive ends."

The only difference, here, is that the Commonwealth is not recovering specifically for harm done to it, in its capacity as a body corporate, but is rather recovering for harm done to the public, in a parens patriae capacity. That does not, however, change the basic nature of civil penalties from a compensatory remedy to a punitive, criminal or quasi-criminal remedy.

In Commonwealth qui tam, ex rel. Johnson v. Betts, supra, the ultimate question, again insofar as relevant

here, was whether the Supreme Court had jurisdiction to review by a writ of error a penalty action before a justice of the peace. The question arose because section 8 of the Act of March 20, 1810, 5 Smith's L. 166, made a justice's action in certain civil proceedings final after review by a court of common pleas. The particular action was to recover for the stopping or obstruction of a drain or ditch constructed for the purpose of draining water from a public road or highway in contravention of section 67 of the Act of June 13, 1836, P. L. 551, for which it was provided that the perpetrator "shall, for every such offence, forfeit and pay a sum not less than four dollars, nor more than twenty dollars."

The action was, as the justice of the peace noted, Commonwealth qui tam, ex rel. Johnson v. Betts, 76 Pa. at 467, clearly a public nuisance action. There was no statutory indication that the "penalty" was to be primarily compensatory, nor was there any requirement that the harm to the public, or to the road, be considered in setting the amount of the penalty, merely that it should be not less than $4 nor more than $20. Deterrence seems to have been the primary purpose. In the case of the Clean Streams Law, supra, multiple remedies have been provided, including criminal fines, civil penalties and public nuisance actions. As we have already noted, an action for civil penalties has as its primary purpose, not punishment or deterrence, but compensation to the public for injury to a public resource.

Furthermore, a reason of policy influenced the court in Betts that is not applicable here—namely, the interest in maintaining the supervision of the Supreme Court of Pennsylvania over the actions of inferior judicial tribunals. The court's final statement of its reason for reaching the conclusion that the action was

one for a criminal offense was as follows, 76 Pa. 471-472:

"Finally, it has been held in several cases, that the jurisdiction of this court cannot be taken away except by express terms or necessary implication: Overseers v. Smith, 2 S. & R. 366; and see note to 2 Brightly's Dig., p. 1350. It is to be noticed that *if our jurisdiction in this case were held to be taken away, it would be upon the merest inference, not necessary, and certainly not irresistible.* This action is not brought under the Act of March 20th 1810, but under the General Road Law of 1836. When the 75th section of the latter act gave the remedy for the recovery of penalties incurred under the act 'in the same manner as debts of like amount are recoverable with costs,' it adopted the provision of the Act of 1810 for the form of the action and mode of proceeding to recover the penalty, *but did not necessarily take away the jurisdiction of this court to supervise the proceeding, and keep the inferior tribunals within their proper bounds.* We are *therefore* of opinion that an action such as this, in the name of the Commonwealth, to recover a penalty for a statutory offence, is not a civil action, such as is meant in the 22d and 24th sections of the Act of 1810. It may be so in form, but in its true nature and effect, it is a proceeding for a criminal offence, *the supervision of which the essential interests of the public require to belong to this court.*" (Italics supplied.)

We conclude that the holding and reasoning of Commonwealth qui tam, ex rel. Johnson v. Betts, supra, is not applicable to actions for civil penalties under the Clean Streams Law, supra.

Bachman v. Messina, supra, also involved a question of appellate jurisdiction. But it seems to us that the key phrase in that decision is the following, 45 D. & C. at 52:

"While a suit for a penalty is a civil action in form, we think it may be said to be a criminal proceeding in essence. Such an action has as its sole purpose *punishment* of an individual for an offense against *the public*, as typified by the Commonwealth or borough or township or other municipality." (Emphasis in original.)

Again, we have already concluded that the primary purpose of an action for civil penalties under the Clean Streams Law is compensation for a harm to the public and is, therefore, civil, not criminal, in nature.[3]

---

[3] Parenthetically, we note that even if the presence of the "degree of willfulness" factor were held to limit discovery with respect to that issue, the cases would not support a limitation of discovery where the defendant is a corporation, as here. It is true, as defendant notes in its brief, that the government generally has no right to invoke discovery against the defendant in a criminal case. See 23 C. J. S. §995, 1034, cited by defendant. When one goes behind the bare statement of that "rule," however, one finds that it is based on the fifth amendment right of a defendant in a criminal case not to testify, the right to stand silent and demand strict proof by the government of all aspects of its case. As Justice Black said, dissenting in Williams v. Florida, 399 U. S. 78, 111-12 (1970):

"The Framers [of the Bill of Rights] were well aware of the awesome investigative and prosecutorial powers of government and it was in order to limit those powers that they spelled out in detail in the Constitution the procedure to be followed in criminal trials. A defendant, they said, is entitled to notice of the charges against him, trial by jury, the right to counsel for his defense, the right to confront and cross-examine witnesses, the right to call witnesses in his own behalf, and the right not to be a witness against himself. All of these rights are designed to shield the defendant against state power. None are designed to make convictions easier and taken together they clearly indicate that in our system the entire burden of proving criminal activity rests on the State. The defendant, under our Constitution, need not do anything at all to defend himself, and certainly he cannot be required to help convict himself. Rather he has an absolute, unqualified right to compel the State to

We find no support in the cases cited, or elsewhere, for the proposition urged by defendant that the identity of plaintiff, whether a private individual or a governmental entity, is the determining factor as to whether a particular action is civil or criminal.

We note that Illinois, which has a civil penalties provision in its Environmental Control Act (Illinois Rev. Stat. 1971, Ch. 111-1/2, para. 1041), has also decided that that provision delineates a civil, not criminal remedy. See the well-reasoned opinion in Ford v. Environmental Protection Agency, 3 ELR 20208, 5 E.R.C. 1107 (No. 72-60, Ill. C. O. App., 3d Dist. Feb. 4, 1973).

We hold that actions for civil penalties are civil actions, and that the discovery procedures set forth in Rule 21.15 of the Board's Rules of Procedure are fully available to both defendant and the Department of Environmental Resources.

investigate its own case, find its own witnesses, prove its own case, find its own witnesses, prove its own facts, and convince the jury through its own resources. Throughout the process the defendant has a fundamental right to remain silent, in effect challenging the State at every point to: 'Prove it!' "

See also McCormick on Evidence, §133, et seq., 282, et seq. (2d Ed., 1972).

But a corporation is not entitled to refuse to testify against itself (Hale v. Henkel, 201 U. S. 43 (1906); George Campbell Painting Corp. v. Reid, 392 U. S. 286 (1968)); and see McCormick on Evidence 269-271 (2d ed., 1972). Because the right to refuse to incriminate oneself is a personal right that cannot be claimed for the benefit of another, no employe can claim that right on behalf of the corporation. Nor can an employe claim that right on his own behalf if the records sought to be protected are those of the corporation (Wilson v. United States, 221 U. S. 361 (1911)); and see McCormick on Evidence 271-72 (2d ed., 1972). Hence, the protection sought by defendant herein, a corporation, would not be available *to it* even had we held that actions for civil penalties are criminal in nature. The *reason* for the rule sought to be invoked would not be applicable. *Cessat ratione legis, cessat ipsa lex.*

## III. *SPECIFIC OBJECTIONS*

Defendant also argues that certain of the interrogatories filed by the Department are objectionable under Rule 4011 of the Pennsylvania Rules of Civil Procedure, made applicable to discovery procedure before this board by Rule 21.15 of our Rules of Procedure. Objections are raised to interrogatories 3 through 12 on the grounds of relevancy, to interrogatories 4(g), 7, 10(d) and 11(d) on the grounds that defendant is asked to summarize the contents of documents, to interrogatories 10 and 11 on the grounds that defendant is asked to state a legal conclusion, and to interrogatories 7, 10, and 11 on the grounds that defendant is asked to make an unreasonably burdensome investigation in order to answer those interrogatories.

The board overrules the objections based on relevancy. This is not to say that all the information sought would necessarily be admissible at trial. That is not, however, the test for purposes of determining whether or not such information is discoverable. Furthermore, whether it is or is not relevant even for purposes of admissibility at trial cannot be told with certainty until it is known what the information is.

We sustain the objections with respect to interrogatories 10 and 11, insofar as a legal conclusion is requested. If those interrogatories are rephrased in terms of mine drainage exceeding specified concentrations of specified substances, an order will be issued requiring an answer. Since mine drainage of some sort was presumably discharged nearly continuously, a request for information as to when mine drainage, without more specification, was discharged asks (a) for *all* records and information (which does not appear to have been the intent of the interrogatories), or (b) for a legal conclusion, or (c) is too vague to answer.

We sustain the objections to interrogatories 4(g), 7 and 10(d), insofar as those interrogatories request defendant to summarize the contents of documents. The proper way to discover the contents of those documents, if any, is to petition for an order requiring their production for inspection.

We also sustain the objections to interrogatories 7, 10 and 11, unless they can be made specific as to particular individuals whose knowledge is being asked for. The interrogatories in question ask for the knowledge of a corporate defendant. The signer of the answers would be hard put, without an investigation that seems to us unreasonable, to have any confidence that the answers were, in fact, complete and accurate. Cf. Minichino v. Borough of Quakertown, 88 D. & C. 83 (C. P. Bucks Co., 1954); Graham v. Peoples Natural Gas Co., 35 D. & C. 2d 717 (C. P. Allegheny Co., 1965); Witlin v. Pennsylvania Railroad Co., 18 D. & C. 2d 176 (1959). As the court said in Witlin v. Pennsylvania Railroad Co., 18 D. & C. 2d at 179:

"In order to answer an apparently simple factual question, therefore, it would be necessary for a corporate litigant to discover which of its employes has any knowledge with respect to each of the various interrogatories propounded; then, with respect to each question, the corporate litigant would be required to collate the answers of each of its employes having any knowledge of the question. If, as is likely, the answers of the different employes should vary, the corporate litigant would be required to either state the answers of each of the employes, or else someone within the corporation would be required to analyze the various answers and form a judgment as to the correct answer, and give as the answer of the corporate litigant his individual judgment."

## ORDER

And now, February 7, 1974, defendant Harmar Coal Company is ordered to file answers to interrogatories 1, 2, 3, 4, 5, 6, 8, 9, 12 and 13 as filed by the Department of Environmental Resources in the above-captioned cases except as limited by the above opinion. The board will consider requiring answers to other interrogatories filed by the department, framed so as to meet defendant's objections as sustained herein, when and if filed.